**Case Numbers: 24-2030, 24-2031, 24-2032, 24-2033, 24-2034**

**24-2035, 24-2036, 24-2037, 24-2038**

# United States Court of Appeals for the Federal Circuit

RECEIVED
AUG 29 2024
United States Court of Appeals
For the Federal Circuit

**FRANZ A. WAKEFIELD, D|B|A COOLTVNETWORK.COM, INC.**
***Plaintiff-Appellant***

**v.**

**BLACKBOARD, INC., FACEBOOK, INC., INTERNATIONAL BUSINESS MACHINES CORPORATION, KALTURA, INC., LIMELIGHT NETWORKS, INC., MICROSOFT CORPORATION, OOYALA, INC., SNAP, INC., TRAPELO CORP.,**
***Defendants-Appellees***

**Appeals from the United States District Court for the District of Delaware in the following Case Numbers: 1:19-CV-00291-JLH, 1:19-CV-00292-JLH, 1:19-CV-00293-JLH, 1:19-CV-00294-JLH, 1:19-CV-00295-JLH, 1:19-CV-00296-JLH, 1:19-CV-00297-JLH, 1:19-CV-00534-JLH, 1:19-CV-00535-JLH, PRESIDING, THE HONORABLE JENNIFER L. HALL.**

## APPELLANT "WAKEFIELD'S" CORRECTED INITIAL BRIEF

**Date: August 28, 2024**

/s/ Franz A. Wakefield

**Franz A. Wakefield, *Pro Se***
**D|B|A COOLTVNETWORK.COM, INC.**
4 WEST LAS OLAS BOULEVARD; SUITE 1206
FORT LAUDERDALE, FLORIDA 33301
TELE: 305-206-4832
EMAIL: FRANZWAKEFIELD@COOLTVNETWORK.COM

# UNITED STATES PATENT №: 7,162,696

## Independent Claim 1.

**A Multifunctional Hot Spot apparatus comprising:**
**at least one hot spot defined by a communication with instructions stored on a tangible retaining medium;**

**at least one of the hot spots being accessible from a globally accessible network;**

**means for performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot;**

**wherein said hot spots reside on and are accessible from a digital video or audio file;**
**wherein said predetermined functions are selected from a mode control;**
**wherein the mode control comprises a plurality of modes;**
**wherein the plurality of modes comprise a shop mode, a bid mode, an interact mode, an entertainment mode, and a link mode;**
**wherein a specific mode is selected by a user through an expandable graphical user interface bar;**
**wherein said specific mode further toggles based on time stamps in said digital video or digital audio file;**
**wherein said hot spots are visualized by outlines, shading, or illumination or a combination of each, at a predetermined area on the display;**
**wherein said Multifunctional Hot Spot apparatus is made to reside on and is executing on a computing system;**

**means, defined by said instructions, for selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot.**

# Independent Claim 15.

- (*Claims 17, and 18 also, do not use "means" for or "step" for language*).

**A tangible computer readable storage medium having computer readable program code portions stored therein, such that, when executed in a computer causes the computer to perform the steps of:**

**defining at least one hot spot by a communication with instructions stored on a tangible retaining medium;**

**accessing at least one of the hot spots from a globally accessible network;**

**performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot;**

**wherein said hot spots reside on and are accessible from a digital video or audio file;**
**wherein said predetermined functions are selected from a mode control;**
**wherein the mode control comprises a plurality of modes;**
**wherein the plurality of modes comprise a shop mode, a bid mode, an interact mode, an entertainment mode, and a link mode;**
**wherein a specific mode is selected by a user through an expandable graphical user interface bar;**
**wherein said specific mode further toggles based on time stamps in said digital video or digital audio file;**
**wherein said hot spots are visualized by outlines, shading, or illumination or a combination of each, at a predetermined area on the display;**
**wherein said Multifunctional Hot Spot apparatus is made to reside on and is executing on a computing system;**

**selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot.**

# TABLE OF CONTENTS

**Page Numbers**

**I. Statement of Related Cases..........................................................1**

**II. Jurisdictional Statement..........................................................1-4**

**III. Statement of the Issues..........................................................4-7**

**IV. Statement of The Case and Facts..........................................7-18**

**a. Background of The Invention..........................................7-9**

**b. Statement of the Case..........................................10-12**

**c. The Trial Court's Decision Was Wrong, & Invalidated.....13-18 Appellant ("WAKEFIELD'S") Patent Based on The Wrong Application of Law.**

**V. Summary of the Argument..........................................19-22**

**VI. Standard of Review..........................................................22**

**VII. Argument..........................................................23-46**

**a. <u>The Prior Appellate Panel Failed to Remand</u>: Because.....26-32 The District Court Failed to Complete the 2-Step Process For Independent Claims 15, 17, and 18; And Failed to Recognize the Algorithm in The Specification that Supports The Means-Plus Language of Independent Claim 1.**

**b. <u>JAVA Applets</u>: Are Well Known in The Art & Connotes...32-33 Sufficiently Definitive Structure.**

c. **Unrebutted Testimony and Evidence Ignored By the District Court: Appellees' Expert Dr. Henry Hough Understood the Bounds of the Limitations of Independent Claims 1, 15, 17, and 18 And The Mechanism of URL Protocol.**......33-39

d. **Appellant ("WAKEFIELD'S") Constitutional Rights Should Not Be Deprived: It Is Illegal To Have A Judge With Mental Disability Issues on Any Panel.**......39-42

e. **A Delay Rendering a Rule 60(b) Motion Untimely Can Still Be Considered a Reasonable Delay, Making The Motion Filed Within a Reasonable Time.**...42-46

**VIII. Conclusion**......46

**IX. Addendum**......49

# TABLE OF CITATIONS OF CASES

**CASES** **PAGE NUMBERS**

***Apple, Inc., v. Motorola, Inc.*, 757 F. 3d 1286(Fed. Cir. 2014)........................**

**..........................................................................3, 15, 17, 20, 29, 32**

***American Hoist Derrick Co., v. Sowa & Sons, Inc.*, 725 F. 2d 1350 (Fed. Cir. 1984).....................................................................................18**

***Baldwin Graphic Systems v. Siebert* 512 F. 3d 1338 (Fed. Cir. 2008)...............8**

***Bonito Boats, Inc., v. Thunder Craft Boats, Inc.*, 489 U.S. 141, S. Ct. 971, 103 L. Ed. 2d 118 (1989)..........................................................19**

***Chicot County Drainage District v. Baxter State Bank*, 308 U.S. S. Ct. 317, 84 L. Ed. 329 (1940)...........................................................................12**

***Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP,* 838 F. 3d 1224, 1228 (Fed. Cir. 2016).........................................................................22**

***Crosby v. Bradstreet Co.*, 312 F. 2d 483 (2d Cir.), cert. denied, 373 U.S. 911, 83 S. Ct. 1300, 10L Ed. 2d 412 (1963)....................................11, 12**

***DDR Holdings, LLC v. Hotels.com*, 773 F. 3d 1245,'157 (Fed. Cir. 2014).........9**

***Dyfan, LLC v. Target, Corp.*, 28 F 4th 1360 (Fed. Cir. 2022)........................**

**..............................................1, 5, 11, 16, 20, 21, 22, 24, 25, 26, 27, 30**

***Flo Healthcare Solutions, LLC v. Kappos*, 697 F. 3d 1367 (Fed. Cir. 2012)......30**

***Gonzalez v. Crosby*, 545 U.S. 524 (2005), 125 S. Ct. 2641..........................40**

***Good Luck Nursing Home, Inc. v. Harris, and Chicago E. Ill. R.R. v. Illinois Cent.* 2 RR 261 F. Supp 289 (N.D. Ill. 1966)........................................26**

*Google LLC v. Oracle America, Inc.*, 593 U.S. (2021)..............................32

*Gordon v. Monoson*, 239 F. App'x 710 (3d Cir 2007)..............................46

*In re* Diet Drugs (Phentermine/Fenfluramine/Dexfednfluramine) Product Liability Litig., 383 F. App'x 242, 246 (3d Cir. 2010)..............................43, 44

*In Re Wands*, 858 F. 2d 731 (Fed. Cir. 1988)..............................28

*Inventio v. Thyssenkrupp Elevator Amercs* 649 F. 3d 1350 (Fed. Cir. 2011).....31

*Lighting World, v. Birchwood Lighting*, 382 F. 3d 1354 (Fed. Cir. 2004).........32

*Marshall v. Board of Education*, 575 F. 2d 417, 422 (3d Cir. 1978)...............12

*Microsoft Corp. v. i4i Limited Partnership*, 564 U.S. 91 (2011).....................19

*Murray v. DiGuglielmo*, Civil Action No. 09-4960 (E.D. Pa. June 27, 2016)....43

*Oracle America, Inc., v. Google, Inc.*, 750 F. 3d 1339, 1349 (2014)................33

*Personalized Media Communications, LLC v. Int'l Trade Comm'n* 161 F. 3d 696, 705 (Fed. Cir. 1998)..............................31

*Pfizer, Inc. v. Apotex, Inc.*, 480 F. 3d 1348 (Fed. Cir. 2007)..........................22

*Radio Corp. of America v. Radio Eng. Lab, Inc.*, 293 US 1 55 S. Ct. 928, 79 L. Ed. 163 (1934)..............................19

*Salazar v. District of Columbia*, 633 F. 3d 1110 (D.C. Cir. 2011)...................41

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F. 3d 1335, (Fed. Cir. 2015).........22

*Turner v. Rogers*, 564 U.S. 431 (2011)..............................11

*United States v. Ohio Power Co.*, 353 U.S. 98 (1957)..............................22

*United States v. One Toshiba Color Television*, 213 F. 3d 147, 157-58 (3d. Cir. 2000) (en banc)..............................45

*V.T.A., Inc. v. Airco, Inc.*, U.S.C.A. 10th Cir.; 597 F. 2d 220 (10th Cir. 1979)....12

*Williamson v. Citrix Online, LLC.*, 792 F. 3d 1339, 1349 (Fed. Cir. 2015)........

.......................................................................3, 16, 20, 21, 22, 23, 24, 25, 27

*Zeroclick, LLC v. Apple Inc.*, 891 F. 3d 1003 (Fed. Cir. 2018).3, 11, 23, 25, 27, 29

**STATUTES**

28 USC § 1295(a).................................................................4

28 USC §§ 1331 AND 1338(a).......................................................1

28 USC § 46(b)...............................................................6, 11

35 USC § 112, ¶ 2...............................................................20

35 USC § 282(a)..................................................................19

§ 112, ¶ 6.........................2, 3, 6, 11, 16, 19, 20, 23, 24, 25, 26, 28, 29, 30, 32

**JUDICIAL RULES**

Rule 60(b)...............................................3, 4, 5, 16, 42, 43, 44, 46

Rule 60(b)(4)-(6)..................5, 11, 12, 21, 22, 38, 39, 40, 41, 42, 43, 45, 46

Rule 60(b) (5) and (6)...........................................22, 40, 41, 42, 44, 45

Rule 60(c)(1)..............................................................12, 41, 42, 45

**CONSTITUTIONAL PROVISIONS**

**14th Amendment..........................................................................6, 25**

**Article I, Section 8.......................................................................3**

**OTHER AUTHORITIES**

**7 Moore's Federal Practice (2d ed. 1978)....................................12**

**87 Norte Dame L. Rev....................................................................10**

**C. Wright A. Miller.........................................................................12**

**Microsoft Computer Dictionary 5th Edition.................................9, 38**

**Oxford Languages Dictionary..........................................................9**

**Patent Invalidation No. 1:27...........................................................19**

## STATEMENT OF RELATED CASES

This is a group of consolidated appeals from the following district court cases: №s: 19-CV-00291-JLH, 19-CV-00292-JLH, 19-CV-00293-JLH, 19-CV-00294-JLH, 19-CV-00295-JLH, 19-CV-00296-JLH, 19-CV-00297-JLH, 19-CV-00534-JLH, 19-CV-00535-JLH.

## JURISDICTIONAL STATEMENT

This appeal is based on an original action for patent infringement by APPELLANT, FRANZ A. WAKEFIELD, who is *doing business as* COOLTVNETWORK.COM, INC., ("WAKEFIELD"), against BLACKBOARD, INC., FACEBOOK, INC., INTERNATIONAL BUSINESS MACHINES CORPORATION, KALTURA, INC., LIMELIGHT NETWORKS, INC., MICROSOFT CORPORATION, OOYALA, INC., SNAP, INC., AND TRAPELO CORPORATION, (collectively, "APPELLEES") in the United States District Court for the District of Delaware. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, and 1338(a). On July 16, 2021, the district court issued a final judgment. **See. Appx00018-Appx00032.**

On ***November 21, 2023***, APPELLANT ("WAKEFIELD") filed a Rule 60 Motion, based on an ***intervening clarification*** of the law brought to light by the precedential ruling in ***Dyfan, LLC v. Target, Corp.*, 28 F 4th 1360 (Fed. Cir. 2022), *on March 24, 2022***, which ***clarified*** when to give effect to the presumption against

the application of § 112, ¶ 6, as it pertains to the Independent Claims 15, 17, and 18 of APPELLANT ("WAKEFIELD'S") invalidated patent №: 7,162,696; which was uncovered by APPELLANT ("WAKEFIELD") during the ***investigation*** into Judge Pauline Newman's mental status, when the Special Committee of the Federal Circuit issued and published recommendations to the Judicial Council, on the Federal Circuit website.

On ***September 20, 2023, an order*** of the Judicial Council issued suspending Judge Pauline Newman, who sat on APPELLANT ("WAKEFIELD'S") initial appellate panel which affirmed the invalidation of United States Patent №: 7,162,696, because the patent *allegedly* did not disclose an algorithm in the specification that corresponds to the claimed "means" functions of Claim 1's means-plus-function limitations. APPELLANT ("WAKEFIELD") contends that the ***defective panel*** overlooked, because of the inclusion of Judge Newman, crucial evidence during the appeal which proves that Independent Claim 1 was supported by an algorithm documented in the specification of the subject patent, the fact that Independent Claims 15, 17, and 18, does not use "means" or "step" for language, and that APPELLANT ("WAKEFIELD") did not concede that Claims 15, 17, and 18 were means-plus-function claims.

Thus, the district court should have conducted a meaningful means-plus-function analysis (i.e. complete the 2-Step process) for Independent Claims 15, 17,

and 18, as it pertains to the "presumption" for the application of § 112, ⁋ 6 when means-plus-language is not used in a claim limitation.

The ***September 20, 2023, order***, the "***Rule 60(b) Event***," of the Judicial Council of the Federal Circuit, *found* that: "(1) the evidence establishes reasonable concerns that ***Judge Newman suffers from a disability preventing*** her from ***effectively discharging the duties of her office***." *Emphasis added.* **See. Appx00033-Appx00041 , Appx00040 ,** ***and Id.*** **at ⁋ 1.** APPELLANT ("WAKEFIELD") believes that, in his prior appeal, the appointment and inclusion of Judge Newman, who had a witnessed—20 court staff, and documented state of deteriorating mental capacity over a 2-year period and while serving on APPELLANT ("WAKEFIELD'S") prior appellate panel, displaced the equilibrium and dynamics of his prior appellate panel, causing a defect in the integrity of the proceeding which caused the Federal Circuit to affirm the district court's ruling, which is in conflict with its own precedents in: ***Williamson v. Citrix Online, LLC.***, **792 F. 3d 1339, 1349 (Fed. Cir. 2015)**, ***Zeroclick, LLC v. Apple Inc.***, **891 F. 3d 1003 (Fed. Cir. 2018)**, and ***Dyfan***; ultimately violating and nullifying APPELLANT ("WAKEFIELD'S") Due Process, and Constitutional Rights predicated by Article I, Section 8, which authorizes Congress to secure for limited times to inventors, the exclusive right to their discoveries.

On ***January 25, 2024***, the district court issued a final order denying APPELLANT ("WAKEFIELD'S") Rule 60 Motion as "untimely." **See. Appx00001 – Appx00002.** APPELLANT ("WAKEFIELD") timely filed a Notice of Appeal on ***June 17, 2024***. **See. Appx00046 – Appx00051**. This Appellate Court of the Federal Circuit has jurisdiction under 28 U.S.C. § 1295(a).

## STATEMENT OF THE ISSUES

During APPELLANT ("WAKEFIELD'S") petition to the Supreme Court of the United States in the prior group of consolidated cases on appeal, on or after ***March 24, 2023***, Chief Judge Kimberly A. Moore, of The Federal Circuit, issued an order and began the formal ***investigative process*** under Rule 5 of the Rules for Judicial Conduct and Judicial Disability proceedings against Judge Pauline Newman under the Judicial Conduct and Disability Act.

On ***September 20, 2023***, ***an order*** of the Judicial Council of the Federal Circuit was issued and published on the Federal Circuit website, suspending Judge Pauline Newman and ruled that: "(1) the evidence establishes reasonable concerns that Judge Newman suffers from a disability preventing her from effectively discharging the duties of her office." **See. Appx00040** , and ***Id.*** **at ¶ 1.**

**1.** The district court decided incorrectly that APPELLANT ("WAKEFIELD'S") Rule 60 Motion "is denied at least for the reason that

it is untimely." **See. Appx00001** The district court failed to take into account that the Rule 60 Motion was filed on ***November 21, 2023***, only 2 months after the "***Rule 60(b) Event.***" It is illogical to punish APPELLANT ("WAKEFIELD") as being "untimely" in bringing a Rule 60(b) Motion, when the "***Rule 60(b) Event,***" which voids the judgment, did not occur until approximately 2 years after the district court judgment.

**2.** The district court failed to consider that APPELLANT ("WAKEFIELD") made his Rule 60(b) Motion pursuant to Rule 60(b)(4) – (6), that Rule 60(c), Timing and Effect of the Motion states: "A motion under Rule 60(b) must be made within ***a reasonable time***" (*Emphasis added*), and that the amount of time that constitutes ***a reasonable time*** is not defined by the rule, but turns on the circumstances of each case.

**3.** The district court failed to consider the extenuating and ***extremely rare*** circumstance of having an appellate panel consisting of a judge, ruled by a formal Special Committee and Judicial Council, with overwhelming evidence accumulated during a two year period, which includes the time of APPELLANT ("WAKEFIELD'S") hearing on the date of ***July 7, 2022***, to be eliciting reasonable concerns, that APPELLANT ("WAKEFIELD'S") included panel Judge Pauline Newman, suffers from a disability that prevents her from effectively discharging the duties of her

office and has been witnessed by 20 fellow colleagues, on a daily basis to exhibit: "significant mental deterioration including memory loss, confusion, lack of comprehension, paranoia, anger, hostility, and severe agitation." **See. Appx00075 – Appx00084 , and Appx00084 , *Id.* at ¶ 2.**

4. The district court failed to consider that the right to a properly constituted court of appeals is statutory, under 28 U.S.C. § 46 (b), which states that an appellate panel shall be constituted with *not less* than three capable judges.
5. The district court failed to consider that the Due Process Clause of the 14th Amendment is a guarantee and that no state shall deprive any person of life, liberty, or property without due process of law, and that a patent is considered property.
6. The district court failed to consider APPELLANT ("WAKEFIELD'S") Expert testimony on the record which evidences the existence of an algorithm in the specification of the subject '696 Patent that provides structure for the means-plus-functions limitations of Claim 1 and satisfies the requirements of §112 ¶ 6. **See. Appx00421- Appx00431 , Appx00421 , *Id.* at ¶ 126, ¶ 2, and Appx00441 – Appx004442.**
7. The district court failed to perform a meaningful means-plus-function analysis, by failing to apply the 2-Step Process to Claims 15, 17, and 18 of APPELLANT ("WAKEFIELD'S") patent №: 7,162,696, which does *not*

use "means for" or "step for" language, as ***clarified*** by the recent precedential case *Dyfan*. **See. Appx00457 – Appx00458.**

## STATEMENT OF THE CASE AND FACTS

## I. BACKGROUND OF THE INVENTION

During the Prosecution History of the '696 Patent, the Examiner drafted the independent claims of the '696 Patent, with *presumed enabled and definite limitations*, which was certified and approved by the Primary Examiner, and the PTO Supervisor. **See. Appx00535 – Appx00538**. The following is the Examiner's statement of reasons for allowance: "In regards to [the] independent claims [...] the prior art found does not teach a ***multifunctional hot spot apparatus comprising*** all of the following specific modes: a shop mode, a bid mode, and interact mode, an entertainment mode, and a link mode; wherein a specific mode is selected by ***a user*** through ***an expandable graphical user interface bar***; wherein said specific mode further toggles based on time stamps in said digital video or digital audio file; and wherein ***with the selection of a particular hot spot***, a ***predetermined function*** is executed ***based on the mode currently active***; in **combination** with all of the other

claim limitations."[1] *Emphasis added*, **See. Appx00597 - Appx00601 , and Appx00601.**

The '696 Patent is directed to an interactive software based system and device having processor readable code, stored on a tangible medium—(i.e., a server or one or more hard drives) that facilitates the use of a digital media file, such as a digital video source or video stream as a conduit for accessing, ***by clicking***, related or targeted information through Multifunctional Hot Spots---(i.e., an area in or near the video on the screen display that contains hyperlinks to URL addresses and/or targeted databases). **See. Appx00052 - Appx00068 ; and Appx00063 - Appx00064 , and *Id.* at 4:37-5:7.** The Multifunctional Hot Spots may access information within the user's system, a globally accessible network, or any local area network by the ***Launching of the URL***---(*i.e., activating the URL, Id.* at 6:4-17; and 8:3-7), associated with the Hot Spot upon it being ***clicked***---(i.e., by the process of ***hyperlink protocol***; the most common of which is called **HTTP**).

Hypertext Transfer Protocol, which is *well known* to those skilled in the art, consists of the following sequence: (1. the ***browser*** looks up the IP address for the URL (domain), 2. the ***browser*** initiates TCP connection with the DNS (domain name

[1] The Federal Circuit reaffirmed in *Baldwin Graphic Systems v. Siebert* 512 F. 3d 1338 (Fed. Cir. 2008) that an indefinite article "***a***" or "***an***" carries the meaning of "***one or more***" in open-ended claims containing the transitional phrase "***comprising***."

system), 3. the ***browser*** sends the URL (HTTP domain) request to the DNS server, and 4. the DNS server processes the request and sends back a response by displaying the ***webpage or content*** located at the URL that was ***clicked***.) See. *Microsoft Computer Dictionary, 5th Edition*; **See. Appx00537 - Appx00538** ; ***Also* See. Appx00616 - Appx00622**. This process is completed by the *ClickVideoShop*™ Invention on a screen display, in a manner that does not transport the viewer from the host website, application, and/or video, when the Multifunctional Hot Spot is ***clicked***---(i.e., *selected* and *activated*); hence dramatically reducing the viewer bounce rate[2] from the playing video, website, and/or application. See. *DDR Holdings, LLC., v. Hotels.com*, 773 F. 3d 1245, 157 (Fed. Cir. 2014), (where the Federal Circuit determined a hybrid website that did not transport a user away from the host website when a banner ad is clicked, was patent eligible.); ***Also* See. Appx00052 - Appx00068** , and ***Id.* at 2:43-63; 4:9-12; 4:37-58; 5:44-47; 5:57-6:21; FIG. 3—9:15-17.**

---

[2] Bounce Rate: is "the percentage of visitors to a particular website who navigate away from the site after viewing only one page." See. Oxford Languages Dictionary

## II. STATEMENT OF THE CASE

In an ongoing effort to uphold the public confidence in the judiciary, the Special Committee made a report and recommendation to the Judicial Council of the United States Court of Appeals for the Federal Circuit on ***July 24, 2024***[3]. **See. Appx00623 – Appx00627**. The report and recommendation states in part as follows:

> "Thwarting the Committee's ability to complete the process established by Congress for determining whether a life-tenured judge suffers from a disability is a serious matter. ***The litigants whose rights are at stake in the cases before this Court deserve to have confidence that none of the judges ruling on their cases suffers from a cognitive impairment that may affect the resolution of their cases.*** They also deserve to have confidence that the mechanisms Congress established for addressing judicial disability function properly and that a judge with such an impairment cannot simply stymie the process…" *Emphasis added.*
>
> "[T]o return Judge Newman to deciding cases—creating ***a risk of harm to litigants and the public***, given the ***ample justification for concern about disabilities connected to the decisional function***." *Emphasis added.*
>
> "In addition, in light of the ***extensive record developed*** in this case, permitting Judge Newman to resume hearing cases would raise a ***serious risk that litigants may be having their disputes decided by a judge who is not fit for executing the duties of her office***." *Emphasis Added.*

APPELLANT ("WAKEFIELD") believes that it is illegal to include Judge Newman, or any judge experiencing an observed deteriorating mental capacity, on

---

[3] Adjudicative and legislative facts are exceptions to the Appellate Court's consideration of new evidence on appeal. See. Joan Steinman, *Appellate Courts as First Responders: The Constitutionality and Propriety of Appellate Courts' Resolving Issues in the First Instance*, 87 NOTRE DAME L. REV. (forthcoming 2012), available at http://ssrn.com/abstract=1911455.

an appellate panel. The Supreme Court has long recognized the importance of having judges who are both physically and mentally capable of performing their duties. On the date of ***June 20, 2011***, the Supreme Court held in *Turner v. Rogers*, 564 U.S. 431, that a judge who presides over a civil contempt proceeding must have "the requisite procedural and substantive knowledge" to ensure the fairness of the proceeding. APPELLANT ("WAKEFIELD") believes that the same standard should apply to his original appeal, and that the presence of a judge with mental disability issues raises serious questions about the fairness of APPELLANT ("WAKEFIELD'S") original appeal; especially when the ruling from that original appeal ***conflicts*** with and ***tacitly overrules*** the appellate court's own precedents.

The right to a properly constituted Court of Appeals is statutory, 28 U.S.C. § 46(b)—Assignment of judges; Panels; Hearings; and Quorum, states in part:

> "(b) In each circuit the court may authorize the hearing and determination of cases and controversies by separate panels, each ***consisting of three judges***, ...The United States Court of Appeals for the Federal Circuit shall determine by rule a procedure for the rotation of judges from panel to panel to ensure that all of the judges sit on a representative cross section of the cases heard and, notwithstanding the first sentence of this subsection, may determine by rule the number of judges, ***not less than three***, who constitute a panel." *Emphasis added.*

The original appellate panel's ruling is directly contrary to its own teachings in the precedential cases, ***Zeroclick*** and ***Dyfan***, which states that it is ***the Court's duty*** to evaluate whether the "presumption" for the application of § 112 ⁋ 6 has been overcome; this evidence is convincing that the inclusion of Judge Newman on

APPELLANT ("WAKEFIELD'S") original appellate panel caused the rendering of a ***defective ruling*** that tacitly overruled this court's own precedents. This failure in the judiciary creates a ***manifest injustice*** that is subject to collateral attack by Rule 60(b)(4)—***which is not bound by the reasonable time requirement of Rule 60(c)(1)***, even though "[a] judgment is not ***void*** merely because it is or may be erroneous. *Marshall v. Board of Education*, 575 F. 2d 417, 422 (3d Cir. 1978); *see Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 374-78, 60 S. Ct. 317, 84 L. Ed. 329 (1940).

[***A judgment may be void***] if the court's action involves a plain usurpation of power or if the court has acted in a manner ***inconsistent with due process of law***." *Emphasis added*. See. 7 Moore's Federal Practice ¶ 60.25 [2] (2d ed. 1978); 11 C. Wright A. Miller, Supra Note 7, at § 2862. ***Violations of other fundamental Constitutional Rights may give rise to voidness as well.*** See. *Crosby v. Bradstreet Co.*, 312 F. 2d 483 (2d Cir.), cert denied, 373 U.S. 911, 83 S. Ct. 1300, 10L Ed. 2d 412 (1963) (***First Amendment Violation***).

"[A] judgment may be void for 60(b)(4) purposes if its entry has occurred in such an arbitrary or ***improper manner that due process has been violated***." *Emphasis added*. See. *V.T.A., Inc. v. Airco, Inc. U.S.C.A.* 10th Circuit; 597 F. 2d 220 (10th Cir. 1979).

## III. The Trial Court's Decision Was Wrong, & Invalidated APPELLANT ("WAKEFIELD'S") Patent Based on The Wrong Application of The Law.

The district court invalidated Claim 1 of the '696 Patent holding that "nothing in the figures or specification describes how the claimed predetermined functions are performed. Consequently, they ***don't support the <u>means</u> for performing limitation***." *Emphasis added.* **See. Appx00026 – Appx00027**. At page fourteen, paragraph five of the report and recommendation the district court states "[t]o sum up, [APPELLANT] does not point to ***any algorithm*** that clearly corresponds to the claimed function." *Emphasis added.* At page seventeen, paragraph five the district court states "[APPELLANT'S] construction does not identify ***the algorithm corresponding*** to the '***<u>means</u> for selecting and activating***' limitation of claim 1. Accordingly, I agree with [APPELLEES] that the limitation is indefinite." *Emphasis added.* **See. Appx00030**. The District Court failed to consider APPELLANT ("WAKEFIELD'S") expert testimony that proves, an algorithm exists, as referenced below:

> "The software of the invention 100, 200, hot spots and corresponding objects or applications are platform independent and <u>may be defined in one or more databases</u>. The hot spots <u>may be programmed with hyperlinks, JAVA applications and/or other types of applications</u> based code for performing various functions while a user is residing in a video file, audio file or other location within a webpage or website, such as making a bid in a bidding or auction system mode 91, linking to another web page or URL address in a link mode, linking to other videos or audio files in an entertainment mode, placing a digital telephone call in a digital call mode, or transmitting or accessing other types of communications, systems (e-mail, etc.) and

information, as shown in FIGS. 1A 3. The invention 10 embeds, links or makes available multifunctional hot spots that change modes automatically based on predetermined parameters or user interaction with the menu bar 93 in the video file, audio file or other type of digital file or location with the corresponding website or webpage. ***Id.* at 4:56-5:7**, emphasis added, ***description of, among other things, implementation and algorithms***" *Emphasis Added.*

*Also,*

The invention 10 may incorporate HTML language or a comparable language for loading documents through a web browser. The HTML document loaded by the web browser may contain a downloadable custom plug-in(s) that implements an algorithm, and/or tags that specify, among other things, the path to a Java applet containing the object, source, executable or application code necessary to execute the multifunctional hot spots and currently active function as defined by a predetermined parameter or user input the path to the video or audio file that the applet will play and/or the path to a data file that contains variables used to create objects and/or applications having the information needed to identify, define and activate the multifunctional hot spots and their location in designated areas on the screen or in the corresponding digital file. A data file contains tags that can specify various functions when a hot spot is activated, such as, whether the video file should only play once or play in a continuous loop the URL of the web page or website to open when a hot spot is activated an electronic signature that uniquely identifies a user and item(s) for adding to a shopping cart the URL of a video file or audio file to play when a hot spot is activated an electronic signature that uniquely identifies a purchased or auctioned item such that a request or bid for it can be entered into a multicast bidding or purchasing system and/or an electronic signature that uniquely identifies an item or area on the screen that once initiated a communication system/digital calling system is activated in accordance with the digital call mode 95. ***Id.* at 5:57-6:17, emphasis added, description of, among other things, details about implementation of creating and managing hotspots**" *Emphasis Added.* **See. Appx00421- Appx00431 , and Appx00441 – Appx00442 , APPELLANT ("WAKEFIELD'S") Expert testimony pinpointing *algorithm*, and *algorithm* documentation in the Joint Claim Chart.**

Furthermore, the district court also ***applied the wrong law***, and invalidated Independent Claims 15, 17, and 18 of the '696 Patent, ruling in error, the following:

**a.** "Independent claims 15, 17, and 18 ***do not use means-plus-function language***. But they each have a limitation ***very similar*** to the 'means for performing' phrase in claim 1. Specifically, they require 'performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot.'" *Emphasis added.* **See. Appx00031.**

"***[APPELLEES] contend that those phrases should be interpreted the same way as the means for performing limitation in claim 1***. In other words, [APPELLEES] argue that the performing limitations in the dependent [sic] claims should be ***treated as means-plus-function limitations and held indefinite***." *Emphasis added.* **See. Appx00031.**

"***As I have concluded that 'means for performing' in claim 1 is indefinite, I also therefore conclude that the 'performing' phrases in claims 15, 17 and 18 are indefinite***." *Emphasis added.* **See. Appx00031.**

**b.** "I also ***conclude that the 'selecting and activating' limitations in claims 15, 17, and 18 are indefinite***." *Emphasis added. **Also*** **See. Appx00457 – Appx00458.**

At the claim construction hearing on ***October 19, 2020***, the presiding Magistrate Judge, Jennifer L. Hall, *now* District Judge Jennifer L. Hall, and APPELLANT ("WAKEFIELD'S") attorney, Mr. Austin Hansley had the following exchange in open court, proving that the district court ***erroneously interpreted*** and invalidated Independent Claims 15, 17, and 18 of the '696 Patent based on a belief that "the ***Federal Circuit expressly overruled*** *Apple Inc., v. Motorola, Inc.*, 757 F.

3d 1286 (Fed. Cir. 2014) and ***rejected the 'strong' presumption*** in *Williamson v. Citrix Online, LLC*, 792 F. 3d 1339, 1349 (Fed. Cir. 2015)"[4]

But rejecting the "***strong presumption***" does not alleviate the "***presumption***" that § 112 ⁋ 6 does not apply when "means for" or "step for" language is ***not*** used in an independent claim; and "***poor claim drafting does not allow courts to bypass the presumption that a claim does not invoke § 112 ⁋ 6 in the absence of the word 'means.'*** Nor does it ***relieve courts of their duty to evaluate whether that presumption has been overcome.***" *Emphasis added.* This ***clarification*** was brought to light by this Court's precedent in *Dyfan, LLC v. Target Corp.*, 28 F. 4th 1360 (Fed. Cir. 2022) at pg. 19, which was argued to the district court by APPELLANT ("WAKEFIELD'S") Rule 60 Motion, and by his attorney in the Markman Hearing as quoted below:

**c.** "[APPELLANT'S attorney Mr. Hansley states:] This means-plus-function claim limitation is only contained in claim 1. It is not contained in claims 15, 17, and 18." **See. Appx00437.**

**d.** "[APPELLANT'S attorney Mr. Hansley states:] **We believe that the other claims in this patent don't invoke means-plus-function, and therefore, the presumption doesn't isn't given to the [APPELLEES].**" *Emphasis added.* **See. Appx00437.**

**e.** "[APPELLANT'S attorney Mr. Hansley states:] Your Honor, I would like to address [APPELLEES'] argument. Number one, in page 26 of the joint brief, it is briefed. 'A claim limitation that does not use the phrase 'means for' or 'step for' will trigger a rebuttable presumption that 112(f) does not apply. This presumption is a strong one that is not readily overcome, and,

[4] **See. Appx00435 - Appx00436.**

as such, the Federal Circuit rarely has found a claim limitation to trigger means plus function treatment without the recitation of 'means' language in the claim limitation itself.'

**[The Court:] I am actually kind of surprised you brought that up, Mr. Hansley, since you have cited a case that has been expressly overruled by the Federal Circuit.**

[Mr. Hansley:] […] the Apple vs. Motorola?

**[The Court:] Yes. So no part of this paragraph talks about the claims 15, 17 and 18 that I think we were talking about. And then the language you just cited to me in open court was expressly overruled by the Federal Circuit."** *Emphasis added.* **See. Appx00439**.

**DIAGRAM I.**

What is claimed is:

1. A Multifunctional Hot Spot apparatus comprising:

at least one hot spot defined by a communication with instructions stored on a tangible retaining medium;

at least one of the hot spots being accessible from a globally accessible network;

means for performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot;

wherein said hot spots reside on and are accessible from a digital video or audio file;

wherein said predetermined functions are selected from a mode control;

wherein the mode control comprises a plurality of modes;

wherein the plurality of modes comprise a shop mode, a bid mode, an interact mode, an entertainment mode, and a link mode;

wherein a specific mode is selected by a user through an expandable graphical user interface bar;

wherein said specific mode further toggles based on time stamps in said digital video or digital audio file;

wherein said hot spots are visualized by outlines, shading, or illumination or a combination of each, at a predetermined area on the display;

wherein said Multifunctional Hot Spot apparatus is made to reside on and is executing on a computing system;

means, defined by said instructions, for selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot.

**DIAGRAM II.**

> **15**. A tangible computer readable storage medium having computer readable program code portions stored therein, such that, when executed in a computer causes the computer to perform the steps of:
>
> defining at least one hot spot by a communication with instructions stored on a tangible retaining medium;
>
> accessing at least one of the hot spots from a globally accessible network;
>
> performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot;
>
> wherein said hot spots reside on and are accessible from a digital video or audio file;
>
> wherein said predetermined functions are selected from a mode control;
>
> wherein the mode control comprises a plurality of modes;
>
> wherein the plurality of modes comprise a shop mode, a bid mode, an interact mode, an entertainment mode, and a link mode;
>
> wherein a specific mode is selected by a user through an expandable graphical user interface bar;
>
> wherein said specific mode further toggles based on time stamps in said digital video or digital audio file;
>
> wherein said hot spots are visualized by outlines, shading, or illumination or a combination of each, at a predetermined area on the display;
>
> wherein said Multifunctional Hot Spot apparatus is made to reside on and is executing on a computing system;
>
> selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot.

**Independent Claims 17, and 18 also *do not* use "means for" or "step for" language. See. Appx00066 – Appx00067.**

## SUMMARY OF THE ARGUMENT

35 U.S.C. § 282(a) provides that "[a] patent shall be presumed valid," and continues by stating: "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." The Supreme Court has held, in numerous decisions, that when a court reviews the validity of a patent, the presumption may ***only*** be overcome by ***clear and convincing evidence***. *Microsoft Corp. v. i4i Limited Partnership.*, 564 U.S. 91 (2011); *Radio Corp. of America v. Radio Eng. Lab, Inc.*, 293 U.S. 1 55 S. Ct. 928, 79 L. Ed. 163 (1934); and *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-151, 109 S. Ct. 971, 103 L. Ed. 2d 118 (1989).

"Judge Rich [a principal drafter of the 1952 Patent Act, *in Re Hoist & Derrick Co.*], explained the need for according because the [US]PTO is: a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents." (*Standard of Proof for Patent Invalidation in the U.S. and Japan*, by Yoshinari Oyama; Patent Invalidation No. 1:27).

The district court held on ***November 06, 2020***, **See. Appx00021 – Appx00022**, that the Independent Claims 15, 17, and 18 of the '696 Patent are invalid as

indefinite under 35 U.S.C. § 112, ⁋ 2 based on its view that even though the claim limitations do not use means-plus-function language, that two limitations of the independent claims 15, 17, and 18 are "***very similar***"[5] to the means-plus-function limitations of Independent Claim 1, which were invalidated by the district court, and thus, ***even though they do not*** use "means for" or "step for" language they are still in means-plus-function format and subject to the requirements under §112, ⁋ 6. These claim limitations included in Independent Claims 15, 17, and 18 are as follows:

**"performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot;"** *Emphasis added.* **See. Appx00067** , *And*

**"selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot."** *Emphasis added.* See. *Id.* at 11:47-49.

The district court erroneously interpreted and invalidated Independent Claims 15, 17, and 18 of the '696 Patent, based on a belief that "***the Federal Circuit expressly overruled*** *Apple Inc., v. Motorola, Inc.*, 757 F. 3d 1286 (Fed. Cir. 2014)

[5] **See. Appx00028**

and ***rejected the 'strong' presumption*** in *Williamson v. Citrix Online, LLC,* 792 F. 3d 1339, 1349 (Fed. Cir. 2015)"[6]. *Emphasis added.*

But "***poor claim drafting does not allow courts to bypass the presumption that a claim does not invoke § 112 ¶ 6 in the absence of the word 'means.***' Nor does it ***relieve courts of their duty to evaluate whether that presumption has been overcome.***" *Emphasis added.* This ***clarification*** was brought to light by this Court's precedent in *Dyfan, LLC v. Target Corp.*, 28 F. 4th 1360 (Fed. Cir. 2022) at pg. 19.

On ***March 24, 2022***, *after* APPELLANT ("WAKEFIELD") submitted his briefs in the Appellate Court, the Federal Circuit decided *Dyfan, LLC v. Target Corp.*, 28 F. 4th 1360 (Fed. Cir. 2022); issuing in an order, an ***intervening clarification*** of the law as it pertains to the ***presumption*** against the application of §112, ¶ 6 when means-plus-language is not used in a claim limitation. The Federal Circuit ***further clarified*** a law that the district court interpreted incorrectly and invalidated Independent Claims 15, 17, and 18 of the '696 Patent based on the incorrect application of the law. In *Dyfan*, the Federal Circuit, determined that the district court erred in holding that the disputed limitations are subject to §112(f). And because the district court's conclusion of invalidity was premised on its erroneous application of §112(f), the Federal Circuit reversed its decision. See.

---

[6] **See. Appx00435 – Appx00436 , See. Appx00437 – Appx00440 , and *Also* See. Appx00441 – Appx00442.**

*Dyfan, LLC v. Target Corp.*, 28 F. 4th 1360 (Fed. Cir. 2022), *Also* See. *United States v. Ohio Power Co.*, 353 U.S. 98 (1957) (holding: "[W]e have consistently ruled that the intent in finality of litigation must yield where the interests of justice would make unfair the strict application of our rules.").

Rule 60 (b)(5), and (6) states that "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief." Rule 60 (b)(4) allows APPELLANT ("WAKEFIELD") to motion the court for relief from the judgment if the judgment is ***void***. Thus, this consolidated group of appeals proceeds.

- **STANDARD OF REVIEW**

A finding of indefiniteness is ultimately a matter of law that is reviewed *de novo*. See. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F. 3d 1335, 1341 (Fed. Cir. 2015). To hold a patent invalid for indefiniteness, any underlying evidence must be clear and convincing. *Cox Commc'ns, Inc., v. Sprint Commc'n Co. LP.*, 838 F. 3d 1224, 1228 (Fed. Cir. 2016).

## ARGUMENT

APPELLANT ("WAKEFIELD'S") Appellate Reply Brief, in the original appeal (**See. Appx00639 ; *Also* See. Appx00629 – Appx00639 , (*discussion of sufficient and definite supporting structure that would be known by any person of skill in the art*)**), ***squarely addressed*** the failure of the District Court to enact and apply the 2-Step Process, to preclude the bypass of the "***presumption***" that a claim does not invoke § 112 ¶ 6 in the absence of the word "means." APPELLANT (WAKEFIELD'S") Reply Brief, filed in the Federal Circuit in the original appeal, states at pages 25-26, ¶ E, the following:

> "**Cool Tv Did Not Concede Claims 15, 17, and 18 Were Means-Plus-Function Claims.** […] Appellees improperly contend that [APPELLANT ("WAKEFIELD")] conceded claims 15, 17, and 18 were means-plus-function claims to be treated as claim 1. RB51. This is *simply not true*. Only Appellees argued that claims 15, 17, and 18 were means-plus-function claims and because the terms in those claims did not use the 'means for' terminology, it is presumed that they were not written in a 112 ¶6 format. Hence, [APPELLEES] bore the burden to prove application of 112 ¶6. **See Williamson v. Citrix Online, LLC, 792 F. 3d 1339, 1348-49 (Fed. Cir. 2015) (en banc) (holding when claim does not use 'means' language, patent challenger must overcome [that] 112 ¶6 does not apply.)**. Here, the Magistrate never determined whether Appellees met their burden. Rather, the R&R simply assumed 112 ¶6 was conceded because [APPELLANT ("WAKEFIELD")] did not address the issue in briefing. Appx 0247; Appx0250. Yet, a party's ultimate burden of proof is not overcome simply because the other side remains silent. See Pfizer, Inc. v. Apotex, Inc., 480 F. 3d 1348, 1360 (Fed. Cir. 2007) ('[A] patentee [should] never […] submit evidence to support a conclusion by a judge or jury that a patent remains valid.' (emphasis-in-original)). The Magistrate's willingness to assume an admission regarding claims 15, 17, and 18 further shows that the Magistrate improperly shifted the burden of proof to [APPELLANT

("WAKEFIELD")] and used waiver to avoid Appellees' deficiencies." *Emphasis added.* **See. Appx00639 ;** ***Also*** **See. Appx00629 – Appx00639.**

This argument in APPELLANT ("WAKEFIELD'S") Reply Brief, filed in the Federal Circuit in the original appeal, is sufficiently developed to place the Federal Circuit on notice about the new standard and the duty of the District Court, because the long line of cases utilizing the "***strong presumption***" standard had been overturned by the *Williamson* II (en banc) decision, referenced in the argument quoted from APPELLANT ("WAKEFIELD'S") Reply Brief. The *Williamson* II (en banc) decision by the entire active Circuit was in fact the historical pivotal point that shifted the prior legal standard for claim limitations ***without*** the term "***means,***" and the "***strong presumption***" in the application of § 112, ¶ 6 to functional claim terms and limitations in claim construction, to ***merely*** a "***presumption.***" To say that the Federal Circuit would categorize as *undeveloped,* APPELLANT ("WAKEFIELD'S") argument that references such precedential and supporting historical (en banc) case law, is asinine.

> "The en banc court in Williamson II articulated the new standard as follows: 'The standard is whether ***the words of the claim are <u>understood by persons of ordinary skill in the art</u> to have sufficiently definite meaning as the name for structure***…the presumption can be overcome and ***§ 112, para. 6 will apply if <u>the challenger demonstrates</u> that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.***' ' Id. at * 18-19 (internal

citations omitted)." *Emphasis added*. See. *The Federal Circuit Alters the Means-Plus-Function Analysis*; By William A. Meunier[7].

Failure of the Federal Circuit to enforce and follow its own precedents in the historical (en banc) decision in *Williamson II* decided in 2015, referenced in APPELLANT ("WAKEFIELD'S") Reply Brief filed in the Federal Circuit in the original appeal, the precedent in *Zeroclick,* decided in 2018, and the ***further clarifying*** precedent in *Dyfan*, decided in 2022; by affirming the District Court's ruling which is in conflict with its own precedents, is overwhelming evidence that because of the inclusion of *suspended* Judge Pauline Newman on APPELLANT ("WAKEFIELD'S") original appeal panel; the original appeal---hearing, deliberation process, and ruling, ***succumbed*** to an unfair forum that was a result of 1.) bias, and 2.) a lack of quorum of capable judges in the formation of the appellate panel; which deprived APPELLANT ("WAKEFIELD") of Due Process Rights under the 14th Amendment of the United States Constitution and Equal Protection under the law, creating a *rare* ***manifest injustice***, by ruling that Independent Claims 15, 17, and 18 of the United States Patent: 7,162,696 are indefinite, and thus invalidating APPELLANT ("WAKEFIELD'S") patent.

The original appellate panel failed to ***inquire*** during the ***July 7, 2022*** hearing, **See. Appx00116 – Appx00129** , about the district court's error and failed to

[7] See. https://www.mintz.com/insights-center/viewpoints/2015-07-01-federal-circuit-alters-means-plus-function-analysis

***evaluate*** APPELLANT ("WAKEFIELD'S") argument. Thus, it was the Appellate Court, and not APPELLANT ("WAKEFIELD") that was responsible for the failure to consider the evidence. See. *Good Luck Nursing Home, Inc., v. Harris,* and *Chicago E. Ill. R.R. v. Illinois Cent. R.R.* 261 F. Supp 289 (N.D. Ill. 1966) (***where the Court concluded it had sufficient reason to invoke Rule 60(b) in the circumstances of the case where the Court was responsible for the failure to present and review evidence***).

**A. <u>The Prior Appellate Panel Failed to Remand</u>: Because The District Court Failed to Complete the 2-Step Process For Independent Claims 15, 17, and 18; And Failed to Recognize the Algorithm in The Specification that Supports The Means-Plus Language of Independent Claim 1.**

35 U.S. Code § 112, paragraph 6 provides the following:

> "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." **See. Appx00042 - Appx00043.**

The Federal Circuit, in the precedential case ***Dyfan*** states that "[s]ection 112 ¶ 6 offers patent applicants two options: (1) recite, in the claim, a function without reciting structure for performing the function and limit the claims to the structure, materials, or acts disclosed in the specification (or their equivalents), in which case §112 ¶ 6 applies, or (2) recite both a function and the structure for performing that

function in the claim, in which case §112 ⁋ 6 is inapplicable. *Williamson,* 792 F. 3d at 1347-48 (en banc in relevant part)." *Emphasis added.* In ***Dyfan, LLC v. Target Corp.***, as in this case:

> "[t]he district court also erred by not following [the Federal Circuit's] recent decision in *Zeroclick*. There, the district court determined that the claim limitations 'program' and 'user interface code' invoked §112 ⁋ 6. *Zeroclick,* 891 F. 3d at 1006-07. [The Federal Circuit] reversed, explaining that the district court erred by '***not giving effect to the unrebutted presumption against the application of §112, ⁋ 6.***' Id. at 1008. [The Federal Circuit] further explained that a person of ordinary skill in the art would have been able to 'reasonably discern from the claim language' that the disputed limitations '***program***' and '***user interface code***' were references to conventional programs or code '***existing in [the] prior art*** at the time of the invention[]' and were ***not used as generic terms or black box recitations of structure or abstractions***." *Emphasis added. Id.* at pg. 13.

This is in effect, analogous to this case where the claim language as a whole, prior art references in the patent, and the structural details used in the specification to describe the invention were ignored by the district court. Each of the Independent Claims 15, 17, and 18, including the antecedent basis of the preamble(s) of the claims, the limitation that requires "accessing" at least one of the hot spots from a globally accessible network; along with the language of the limitation terms "***very similar***" to the means-plus-function limitations of claim 1, specifically: "performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot;" and "selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot", coupled with the structural references in the specification of the '696 Patent,

provides ***sufficiently definite structure*** discernible by a person of ordinary skill in the art. For example, at column 2, lines 55-63, of the '696 Patent, which states that:

> "The multifunctional hot spots [of the '696 Patent] preferably comprise ***hyperlinks to other URL addresses and/or targeted databases***. The multifunctional hot spots are preferably delineated by outlines or illumination, as visual cues to alert the user that ***clicking*** within the 'multifunctional hot spot area will' give them ***access*** to additional information, files or locations. This is ***analogous to a hypertext link being highlighted in an HTML format*** when the ***cursor*** moves over it." *Emphasis added.* **See. Appx00050.**

This excerpt from the '696 Patent, used in conjunction with the structural terms in the patent specification like "JAVA applet," "tags," "electronic signatures," "HTML Document," "web browser" and "cursor" (**See. *Id.* at Appx00063 – Appx00065 , and *Id.* at 5:57-6:1-21; 3:47-56; and 8:1-28**) would be considered ***sufficiently definite structure discernible*** by a person of ordinary skill in the art to connote familiar structure enabling recreation of the full scope of the invention without undue experimentation, and are ultimately references to the patented CVSSW™ (*ClickVideoShop*™ Software) which builds upon the existing and well-known mechanism of video hot spots and hyperlinks explained in the prior art and referenced in the "Background of the Invention," Section of the '696 Patent.

Thus, these terms as referenced above, are not used as "***generic terms or black box recitations of structure or abstractions.***" See. *In Re Wands*, 858 F. 2d 731 (Fed. Cir. 1988) (where the Federal Circuit set forth the following factors to consider when determining whether undue experimentation is needed to determine whether the full

scope of a computer-implemented functional claim limitation is enabled: (1) the breadth of the claims; (2) the nature of the invention; (3) the state of the prior art; (4) the level of one of ordinary skill; (5) the level of predictability in the art; (6) the amount of direction provided by the inventor; (7) the existence of working examples; and (8) the quantity of experimentation needed to make or use the invention based on the content of the disclosure.). **See. Appx00653 – Appx00656 and See. Appx00657 – Appx00658**.

In *Zeroclick, LLC v. Apple Inc.*, 891 F. 3d 1003, 1008 (Fed. Cir. 2018), "[b]ecuase the disputed limitations were references to ***conventional structures known to persons of ordinary skill*** in the pertinent art, and ***because the district court failed to properly apply the presumption*** and 'made no pertinent finding that compel[led] the conclusion' that the limitations '***user interface program***' or '***code***' were used in common parlance as substitute for 'means,' " [the Federal Circuit] rejected the district court's determination that the claims were subject to §112, ¶6 and vacated judgment of invalidity." *Emphasis added.*

The district court invalidated Independent Claim 1 of the '696 Patent stating that "[t]he closest that [APPELLANT ("WAKEFIELD")] ever came to identifying a corresponding algorithm was in its reply brief. There it suggested that the corresponding structure is a [...] '[JAVA] applet' as set forth in Figures 1A, 1B, 1C, 2A, 2B, and 2C. Regardless, an 'applet' is not a specific algorithm. An applet is a

general word for an application, a computer program. As [APPELLEES] point out, and [APPELLANT ("WAKEFIELD")] hasn't disputed, an applet is a class of algorithms. ***Where the patent uses the term applet, it is simply an abstraction that describes the function being performed.***" *Emphasis added.* **See. Appx00027.**

The district court then ***immediately*** concluded that Independent Claims 15, 17, and 18 were ***indefinite***, failed to give effect to the "***presumption***" that §112, ⁋ 6 does not apply, and held that the claims should be interpreted the same way as the means limitations of Independent Claim 1 of the '696 Patent. The district court ignored the 2-Step Test ***clarified*** in the precedential case ***Dyfan*** and erred by overlooking key evidence--unrebutted deposition testimony of the APPELLEES' expert Dr. Henry Hough regarding how a person of ordinary skill would have understood the "***performing***" and the "***selecting and activating***" limitations, in the context of the patent, and the structural terms used in the specification and the prosecution history of the patent. Unlike Independent Claim 1 of the '696 Patent, which explicitly uses the term "***means,***" Independent Claims 15, 17, and 18, ***do not,*** and thus: "where a claim is not drafted in means-plus-function format, the reasoning in the *Aristocrat* line of cases does not apply and ***an algorithm is therefore not necessarily required.*** The correct inquiry when 'means' is absent from a limitation, is whether the limitation, read in light of the remaining claim language, specification,

prosecution history, and relevant extrinsic evidence, has ***sufficiently definite structure*** to a person of ordinary skill in the art." *Emphasis added.*

"The limitation need not connote a single, specific structure; rather, it may describe ***a class of structures***. See, e.g., *Personalized Media Communications, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed.Cir.1998) ('Even though the term 'detector' does not specifically evoke a particular structure, it does convey to one knowledgeable in the art a variety of structures known as 'detectors.' ')." *Emphasis added.*

"Even if a patentee elects to use a 'generic' claim term, such as 'a nonce word or a verbal construct,' properly construing that term (in view of the specification, prosecution history, etc.) may still provide sufficient structure such that the presumption against means-plus-function claiming remains intact. Id. at 1360; see also *Inventio*, 649 F.3d at 1356–57 ('Claims are interpreted in light of the written description supporting them, and that is true whether or not the claim construction involves interpreting a 'means' clause.');" *Emphasis added.* "[The Federal Circuit has] repeatedly characterized this presumption as '***strong***' ***and*** '***not readily overcome***' and, as such, have '***seldom' held that a limitation without recitation of 'means' is a means-plus-function limitation***. [With *Williamson II*, the "***strong presumption***" became merely a "***presumption***," that cannot be overlooked.]

[In] *Lighting World*, 382 F.3d at 1358, 1362; *Inventio*, 649 F.3d at 1356; [and] also *Flo Healthcare*, 697 F.3d at 1374 [the court held that] ('[w]hen the claim drafter has not signaled his intent to invoke § 112, ¶ 6 by using the term 'means,' we are unwilling to apply that provision without a showing that the limitation essentially is devoid of anything that can be construed as structure.')." *Emphasis added.* See. *Apple Inc., v. Motorola, Inc.*, 757 F. 3d 1286 (Fed. Cir. 2014), **See. Appx00421-Appx00431 ; Appx00441 – Appx00442 , APPELLANT ("WAKEFIELD'S") Expert testimony pinpointing *algorithm*, and *algorithm* documentation in the Joint Claim Chart; and See. Appx00534 , and *Id.* at footnote 1.**

### B. <u>JAVA Applets</u>: Are Well Known in the Art & Connotes Sufficiently Definite Structure.

The facts in *Google LLC v. Oracle America, Inc.*, 593 U.S. (2021); decided on ***April 05, 2021***, during the pendency of the original case before the district court, predicates that ***JAVA SE*** is a popular computer platform that uses the ***JAVA Programming Language*** which utilizes ***JAVA Applets***, and that **<u>millions</u>** of programmers are familiar with the ***JAVA Programming Language***. The facts of the *Google v. Oracle* case prove that there is a ***definite structure inherent*** to the ***JAVA Programming Language***, of which ***JAVA Applets*** are ***<u>snippets of code</u>*** written by ***JAVA Programmers*** (*persons of skill in the art*) to perform a particular task in a

software program. The ***JAVA Programming Language*** utilizes a tool called an Application Programming Interface, or ***API***. "The Federal Circuit described an API as a tool that 'allow[s] programmers to use [...] prewritten code to build certain functions into their own programs, rather than write their own code to perform those functions from scratch.' Oracle America, Inc., v. Google, Inc., 750 F. 3d 1339, 1349 (2014)" *Emphasis added. Id.* at pgs. 3-4.

In the ***JAVA API***, "each individual task is known as a 'method.' The API groups somewhat similar methods into larger 'classes,' and groups somewhat similar classes into larger 'packages.' This ***method-class-package organizational structure*** is referred to as the [...] ***Java API's 'structure, sequence, and organization,'*** or ***SSO***." *Emphasis added. Id.* at Pgs. 4-5.

Contrary to the district court's ruling, ***JAVA Applets*** would be known by persons in the art to connote ***a specific and definite class of structures*** used to perform tasks in a computer program written in the ***JAVA Programming Language***, as referenced in the '696 Patent. **See. Appx00052 – Appx00067 , *Id.* at 5:57-6:1-21; 8:1-9:1-14; *Also*, See. *Id.* at Fig. 2A, box 218, Fig. 2B, boxes 238-272, and *specifically* boxes 232, 238, and 242—(*defining algorithms*), and Figs. 2A-2C.**

### C. Unrebutted Testimony and Evidence Ignored by the District Court: Appellees' Expert Dr. Henry Hough Understood the Bounds of the Limitations of Independent Claims 1, 15, 17, and 18 & The Mechanism of URL Protocol.

The district court erred by ignoring key evidence like unrebutted deposition and declaration testimony from the APPELLEES' own expert, Dr. Henry Hough regarding how a person of ordinary skill would have understood the mechanism of URL Protocol, and the "***performing***" and the "***selecting and activating***" limitations of Independent Claims 15, 17, and 18 of the '696 Patent. For example, in Dr. Hough's declaration filed in the district court the APPELLEES' expert at pages 13-14 ( **See. Appx00163 – Appx00164** ), paragraph forty-four, explains the mechanism of URL Protocol (HTTP), HTML, and hyperlinks ***as being well known in the art***, stating:

> "Web pages are described by a language called the Hypertext Markup Language ('HTML') and the program that interprets the instructions in HTML is known as a web browser. ***Hyperlinks*** within a web page, which a user may select using their web browser, are described in HTML and ***specify*** a Uniform Resource Locator ('***URL***') which specifies ***a method of access*** is most commonly the Hypertext Transfer Protocol ('***HTTP***') which specifies the ***protocol*** to be used by the web browser to access the web server (i.e. the 'http://' that starts most URLs). The location of the document can be the hostname of a web server (e.g., 'www.company.com') combined with a path and filename (e.g., '/articles/first.html')." *Emphasis added.* ***Also*** **See. Appx00164 – Appx00165 ,** ***Id.*** **at ⁋ 46;** *Also* **See. Appx00171 – Appx00173 ,** ***Id.*** **at ⁋ 58; ⁋ 59; and ⁋ 60.**

In his deposition testimony **( See. Appx00271 – Appx00420 )**, APPELLEES' expert Dr. Hough states "I generally agree with the premise that ***it is the user that is***

***interacting with the hot spot***. So it's the plain language of the claims that indicate that the ***hyperlink is selected by the user***." *Emphasis added*. **See. *Id*. at Appx00331 – Appx00332 , *Also* See. Appx00067 , and *Id*. at 11:47-49.**

Dr. Hough, also states in his deposition about the means-plus-function limitations of Independent Claim 1, which are "***very similar***" to the limitations in Independent Claims 15, 17, and 18, the following:

> "Well, I mean, ***the means for performing* [...] *that is what the claim is about***, is about these means for performing. [T]he mode is selected by the user, and that is laid out in [...] lines 55 and 56 of column 9. [L]ater on it does talk about clicking on each particular multifunctional hot spot, which ***a person of ordinary skill in the art would understand that it's the user clicking on the hot spot.*** And then [...] ***that's what would cause this* [...] *the apparatus to perform the predetermined function***. [W]ithout, actually, a user clicking on the hot spot, [...] the action wouldn't be performed. ***So these actions are performed when the user clicks on a hot spot, and which action is performed is determined by which specific mode the user selects***. So the user selects the mode, ***the user clicks***, and then that ***predetermined function***, dictated by the mode, ***is performed***. That's what it's discussing." *Emphasis added*. **See. *Id*. at Appx00331 – Appx00332 ; *Also* See. Appx00067.** *Also*,
>
> "[T]he intent is that each of those modes has an associated function. [...] [A] function could be compound, [...] but it doesn't mean that you select Mode A and then you're doing the functions for Modes A, B and C. That's not the intent. ***The intent is, you select Mode A, and when the user clicks that hot spot when Mode A is selected, the function for Mode A, Function A, let's call it, is performed. And that function could be a series of items, which is compound, but one might call it functions, but it's really a set of functions associated with Mode A***." *Emphasis added*. **See. Appx00340 – Appx00341.**

The APPELLEES' expert Dr. Hough, further explained in his deposition testimony that ***JAVA Applets***, connotes ***sufficiently definite structure to a person of ordinary skill*** in the art. "***A JAVA applet would be written in JAVA language, and it would be any number of different applications***." *Emphasis added.* **See. Appx00373 , *Id.* at. lines 6-13; *Also* See. Appx00293 – Appx00295.**

> "Q. Would applets and ***Java applets*** <u>***have been known to a person of ordinary skill in the art***</u> ***as of the earliest priority date of the '696 Patent***?
>
> A. I would say, generally speaking <u>***applets were known at the time***</u>. [...] [A] developer would develop an applet that could be made available as part of a web page. And there were some particular benefits to using JAVA for applets, along with other types of applets that also had similar benefits that were not in JAVA. ***But Java certainly, people did know the JAVA applets as applets***." *Emphasis added.* **See. Appx00374 , *Id.* at lines 5-22.**

In addition to Dr. Hough's unrebutted testimony the prior art contained in the "Description of the Background Art" Section of the Specification of the '696 Patent explains ***the mechanism*** of how hotspots are "<u>***selected***</u>," "<u>***activated***</u>," and "<u>***performed***</u>;" providing additional ***structure to a person of skill in the art***. The specification teaches:

> "Interactive digital media and the use of hyper-linking tools to visit a designated location or perform a pre-defined function, such as hot spots, are generally known in the art. For instance, hyper-linking tools have been developed for making text and graphics available for interactive use, such as ***linking to pages*** within a website or to other websites, making purchases or initiating other actions. A link is typically made using text, icons, images or other objects appearing in a display to access another text file, program, media function." *Emphasis added.* **See. Appx00062 , *Id.* at 1:36-45.**

> "Based on current technology, ***hot spots and hyper links*** are limited to preordained functions and are internally static, such that they have ***not been programmed or modified*** to perform a wide variety of functions. In addition, hot spots have not been widely adapted or incorporated into video files." emphasis added. **See. Appx00062 , *Id.* at 1:48-53.**

The prosecution history also provides declaration evidence from a person of skill in the art, Mr. Stephen A. Benedict, providing software code written in the **JAVA Programming Language** as a working prototype example of the *ClickVideoShop*™ Invention. **See. Appx00607 – Appx00611**. Mr. Benedict's declaration states in part that:

> "On or after approximately October 20, 1999, I created a software prototype after a conversation with Franz A. Wakefield. This prototype was a proof of concept to illustrate the ideas expressed during the conversation with Mr. Wakefield. [...]The proof of concept conveyed the experience of ***illuminated 'hot spots'*** by compositing pastel-colored polygons onto a video during playback at a specified time for a specified interval[.] The ***proof of concept could perform actions based on the user's action***. For example, ***clicking a 'hot spot' could launch a web browser with a predefined URL. The proof of concept demonstrated that this functionality could be extended to format the URL or perform another action based on the invocation context (single click, double click, right click, etc.). As a result, the 'hot spot' appeared as 'multifunctional' to the user."*** *Emphasis added.*

The '696 Patent claim limitations of Independent Claims 15, 17, and 18, that are "***very similar***" to the means-plus-function limitations of Independent Claim 1; uses the term "**hot spot**" (**See. Appx00067 , *Id.* at 11:27-29**) and "**Multifunctional Hot Spot**" (**See. Appx00067 , and *Id.* at 11:47-49**) both of which ***connotes***

***sufficiently definite structure to a person of ordinary skill in the art***. The APPELLEES' expert Dr. Hough states in his deposition "that it is the user that is interacting with ***the hot spot***. So it's the plain language of the claims that indicate that ***the hyperlink*** is selected by the user", equating ***a hot spot*** with ***a hyperlink***. *Emphasis added*. **See. *Id.* at Appx00331 – Appx00332**. In his declaration, Dr. Hough states "I understand that the parties agree that the claimed '***multifunctional hot spot***' is a ***programmable hyperlink***." *Emphasis added*. **See. Appx00171 , and *Id.* at ¶ 58**.

Relying on Microsoft Computer Dictionary Fifth Edition, Copyright 2002, a ***hyperlink*** is defined as:

> "A connection between an element in a hypertext document, such as a word, phrase, a symbol, or an image, and a different element in the document, another document, a file, or a script. The ***user activates the link by clicking*** on the linked element, which is usually underlined or in a color different from the rest of the document to indicate that the element is linked. Hyperlinks are ***indicated*** in a hypertext document ***through tags*** in markup languages such as SGML and **HTML**. These ***tags*** are generally not visible to the user. *Also called*: **hot link, hypertext link, link.**" *Emphasis added.*

Thus, the word terms "***hot spot***" and "***Multifunctional Hot Spot***," by themselves and in combination with the independent claim(s) as a whole ***connotes sufficiently definite structure***, where "***performing***" the function (i.e. ***Launching the URL*** of the ***hyperlink***) of each "***hot spot/multifunctional hot spot***" is done by the protocol designated by the URL through the web browser, when the user ***clicks*** the

"***hot spot/multifunctional hot spot***" with the ***cursor*** of a mouse and "***selects and activates***" it. Any general-purpose computer with an Internet connection and any ***web browser*** can "***Launch a URL,***" by a user ***clicking*** the hyperlink that contains the URL, to satisfy the "***performing function***" of the first means-plus-function limitation of Claim 1, supported by the algorithm documented at Fig. 2B: boxes 242, 246, 250, 254; and likewise at Fig. 1C: box 138; because the function of "***Launching a URL***" (i.e. "***performing a mode,***" as defined by the '696 Patent) is ***coextensive*** with the structure of a general-purpose computer accessing an HTML document loaded by any ***web browser.*** Similarly, any person of skill in the art would understand that ***a cursor*** is indicative of a mouse used on a computer interface as a pointing device for "***selecting***" and "***activating***" links "***by clicking***" them; and that any mouse can perform ***clicking*** without any special programming. **See. Appx00163 – Appx00164 , *Id.* at ¶ 44; *Also* See. Dictionary Definition of URL and HTTP.**

### D. APPELLANT ("WAKEFIELD'S") Constitutional Rights Should Not Be Deprived: It Is Illegal To Have A Judge With Mental Disability Issues on Any Panel.

On ***September 20, 2023***, an Order of the Judicial Council of the Federal Circuit was ***issued and published*** on the Federal Circuit website suspending Judge Pauline Newman and finding that: "(1) the evidence establishes reasonable concerns that **Judge Newman suffers from a disability preventing** her from **effectively**

**discharging the duties of her office**." *Emphasis added*. **See. Appx00113** , ***Also*** **See. Appx00469** , ***Id.*** **at ⁋ 1-3**. On ***November 21, 2023***, APPELLANT ("WAKEFIELD") filed a Rule 60(b) Motion. **See. Appx00444.**

❖ **FIGURE 1:**




"A litigant's diligence in pursuing review of a decision, either through appeal or through Rule 60(b)(6) relief, is relevant in assessing whether extraordinary circumstances are present." See. *Gonzalez*, 545 U.S. at 537, 125 S. Ct. 2641. In this case, where APPELLANT ("WAKEFIELD") has shown exceptional diligence in pursuing review of the district court's decision: "it would be an ***abuse of discretion*** to rule that a Rule 60(b)(6) motion is not filed within a reasonable time without

finding that the ***movant's delay has prejudiced the non-moving party***. In the instant case, there is not only ***no finding of prejudice***, there has been ***no allegation of prejudice*** by [APPELLEES.]" *Emphasis added.* See. *Salazar v. District of Columbia*, 633 F. 3d 1110 (D.C. Cir. 2011). The APPELLEES, in fact, have not alleged ***any prejudice in the delay*** in APPELLANT ("WAKEFIELD") bringing the Rule 60(b) Motion, and instead have ***only*** stated the ***alleged facts*** of this case. The APPELEES state that APPELLANT ("WAKEFIELD'S") Rule 60(b) Motion should be rejected for the following reasons:

1. "**[APPELLANT] Waived The Relief He Seeks On Rule 60 By Not Pursuing It Earlier**. [APPELLANT ("WAKEFIELD'S")] motion is **untimely** because the challenge raised in the motion was not only available but *actually known* to [APPELLANT] prior to entry of the original judgment in July 2021." *Emphasis added.* **See. Appx00646 , *Id.* at ¶ IV.**
2. "[APPELLANT'S] motion is thus ***untimely because***, as explained in Moolenaar, '***the reason for the attack upon that judgment was available for attack upon the original judgment.***' 822 F. 2d at 1348." *Emphasis added.* **See. Appx00647 , *Id.* at ¶ 2.**
3. "Nor is [APPELLANT'S] current argument—raised more than ***13 months*** after the Federal Circuit's mandate issued and more than ***20 months*** after

the alleged intervening change in law—***timely***. (…) ('As a general rule, a Rule 60(b)(6) motion filed more than one year after final judgment is ***untimely unless 'extraordinary circumstances' excuse the party's failure to proceed sooner***.')" *Emphasis added.* **See. Appx00648 , *Id.* at ⁋ 1.**

Because there is ***no argument of prejudice*** caused by the timing of APPELLANT ("WAKEFIELD'S") Rule 60(b) Motion, it would have been in the sound discretion of the District Court to rule that the motion was brought within a reasonable time. In addition, the facts of this case exemplifies that the **"Rule 60(b) Event"**—the extraordinary circumstance which precluded the earlier filing of the motion, occurred on ***September 20, 2023***, when the Judicial Council issued ***an order*** approximately 26 months after the July 2021 judgment finding that Judge Newman, who served on APPELLANT ("WAKEFIELD'S") prior Appeal Panel, was unfit to serve because of mental disability issues. **See. Appx00468 – Appx00469 , *Also* See. Appx00075 – Appx00084**.

### E. A Delay Rendering a Rule 60(b) Motion Untimely Can Still Be Considered a Reasonable Delay, Making The Motion Filed Within a Reasonable Time.

"A petitioner seeking to invoke Rule 60(b)(5) or (6) must file his motion 'within a reasonable time.' FED. R. CIV. P. 60(c)(1). The amount of time that

constitutes a '***reasonable time***' is not defined by the Rule and ***turns on the circumstances of each case***." *Emphasis added.* See. In re *Diet Drugs (Phentermine/Fenfluramine/Dexfednfluramine) Product Liability Litig.*, 383 F. App'x 242, 246 (3d Cir. 2010). In this case APPELLANT ("WAKEFIELD") filed said Rule 60(b) Motion approximately 2 months after the "**Rule 60(b) Event**"—the ***September 20, 2023,*** order. **See. Appx00033 – Appx00041.**

> "The one-year countdown begins from the date of the 'entry of the judgment.' The period of reasonableness is not tolled by an appeal. *Moolenaar v. Gov't of Virgin Islands*, 822 F. 2d 1342, 1346 N. 5 (3d Cir. 1987). [But in *Murray v. DiGuglielmo*, Civil Action No. 09-4960 (E.D. Pa. June 27, 2016) the Rule 60(b)] Motion is filed almost ***three years after the 'entry of judgment.' Such a period of delay renders [the] motion untimely***. However, the Court [found] that ***the delay was nonetheless reasonable***. Petitioner clearly stated the reason for the three year delay: his mistaken assumption that an appeal tolled the time. While incorrect legally, that is ***understandable, logically***. Given Petitioner's ***pro se*** status, the Court defer[ed] to [the Petitioner's] logic." *Emphasis added.*

The District Court ruled in part that: "***The motion is denied at least for the reason that it is untimely***." *Emphasis added.* **See. Appx00001 – Appx00002**. From the Court's ruling it is impossible to determine when the Court believes the latest date that a Rule 60(b) Motion would be considered filed in a "***reasonable time***" and ***timely***; and what delay would be considered reasonable, considering the facts of this case. Further, the Court has not specified whether the "***untimely***" ruling is pursuant to subsection (5) or (6). APPELLEES' argument in their Answering Brief construes

APPELLANT ("WAKEFIELD'S") Rule 60 (b) Motion as invoking "Rule 60(b)(5) in passing" and they also argue that "[APPELLANT] Does Not Present Extraordinary Circumstances Required For Rule 60(b)(6) Relief." **See. Appx00645 , *Id.* at footnote 5; Appx00648 , and *Id.* at ¶ B.**

But a delay in filing a Rule 60(b) Motion, although it may constitute an "***untimely***" motion (***not filed within one year as the case law suggests***), may ***still nonetheless be reasonable*** based on the circumstances of the case. See. In re *Diet Drugs (Phentermine/Fenfluramine/Dexfednfluramine) Product Liability Litig.*, 383 F. App'x 242, 246 (3d Cir. 2010). It is ***illogical*** to punish *Pro Se* APPELLANT ("WAKEFIELD") as being "***untimely***" in bringing a Rule 60(b) Motion, when the "**Rule 60(b) Event,**" which ***voids the judgment,*** did not occur until approximately 2 years after the District Court Judgment.

In this case a "time-machine" would be needed to acquire the ***September 20, 2023*** order from the Appellate Court that ruled that Judge Pauline Newman has mental disability issues that may render her unfit to serve, and "***go back in time***" to the period within 1 year from the July 2021 judgment, to present evidence in a Rule 60(b) Motion, the evidence of which had not even been published to the public until ***March 24, 2023***, more than 2 years after the July 2021 judgment in the District Court issued. Filing a Rule 60(b) Motion before the occurrence of the "**Rule 60(b) Event**" which APPELLANT ("WAKEFIELD") argues caused the failure in the correct

application of Due Process of the law, and the constitutional infirmity that ***voids*** the July 2021 judgment, which ultimately subjects the erred judgment to collateral attack under Rule 60(b)(4), is impossible. Notwithstanding, a Motion pursuant to Rule 60(b)(4) is not subject to the "***reasonable time***" requirement of Rule 60(c)(1) and a moving party's diligence should be taken into consideration, when determining if a Rule 60(b) delay is nonetheless reasonable. APPELLEES have not alleged any prejudice in the delay in APPELLANT ("WAKEFIELD") bringing said Rule 60(b) Motion and instead have only stated the ***alleged facts*** and their argument in their Answering Brief.

For example, "[t]he record demonstrates that the argument that claims 15, 17, and 18 should be treated differently from claim 1 was not only 'available for attack upon the original judgment,' *id.*, but [APPELLANT] ***actually knew*** about this argument, yet elected to refrain from meaningfully pursing it before the district court or the Federal Circuit." **See. Appx00647 , *Id.* at ¶ 2.** APPELLANT ("WAKEFIELD") ***strongly disagrees*** with this argument. **See. Appx00077 – Appx00084.**

> "[The Third Circuit has] held that ***a Rule 60(b)(4) Motion is not subject to the general requirement of Rule 60(b) that it be made 'within a reasonable time.'*** *United States v. One Toshiba Color Television*, 213 F. 3d 147, 157-58 (3d Cir. 2000) (en banc). It is also true that [the Third Circuit has] allowed parties to file motions under Rule 60(b)(4) where the grounds for the voidness challenge were available at the time of judgment and where the party challenging that judgment failed to pursue those grounds in an appeal. *Friedman v. Wilson Freight Forwarding Co.*, 320 F. 2d 244, 247 (3d Cir.

1963) (addressing the appellant's Rule 60(b)(4) challenge on the merits after finding an 'inexcusable failure to raise an available contention by direct appeal followed by an attempt to litigate the matter later by a motion for post-judgment relief under Rule 60(b)')." *Emphasis added*. See. *Gordon v. Monoson*, 239 F. App'x 710 (3d Cir. 2007).

## CONCLUSION

*Pro Se* APPELLANT ("WAKEFIELD") humbly requests this honorable Appellate Court ***reverse*** the decision of the district court that held that APPELLANT ("WAKEFIELD") was "***untimely***" in bringing the Rule 60 Motion, ***reverse*** the decisions that held Independent Claims 1, 15, 17, and 18 of United States Patent №: 7,162,696 as indefinite, ***rule*** on whether the court legally erred by misunderstanding the '696 Patent's use of the term "***mode***," and whether the court's construction of the terms "***Multifunctional Hot Spot***," "***Hot Spot***," and "***Multifunctional Hot Spot Apparatus***," should require "***a user***" and/or a single type of user, as previously briefed in the prior appeal. Ultimately, APPELLANT ("WAKEFIELD") requests ***remand*** of the case for discovery and further proceedings with ***clarification*** on how the district court should proceed.

Respectfully submitted,

**Date: <u>August 28, 2024</u>** /s/ Franz A. Wakefield

**Franz A. Wakefield, *Pro Se***
**D|B|A COOLTVNETWORK.COM, INC.**
4 WEST LAS OLAS BOULEVARD; SUITE 1206
FORT LAUDERDALE, FLORIDA 33301
TELE: 305-206-4832
EMAIL: FRANZWAKEFIELD@COOLTVNETWORK.COM

## CERTIFICATE OF SERVICE

I, **FRANZ A. WAKEFIELD**, *Pro Se* APPELLANT, certify that on the following date of **AUGUST 28, 2024**, a copy of the: **APPELLANT ("WAKEFIELD'S") CORRECTED INITIAL BRIEF,** was served by FEDERAL EXPRESS on the Clerk of the Court for the Federal Circuit, and via email on the counsel of record.

**Date: August 28, 2024**

/s/ [signature]

**Franz A. Wakefield, *Pro Se***
**D|B|A COOLTVNETWORK.COM, INC.**
4 WEST LAS OLAS BOULEVARD; SUITE 1206
FORT LAUDERDALE, FLORIDA 33301
TELE: 305-206-4832
EMAIL: FRANZWAKEFIELD@COOLTVNETWORK.COM

## CERTIFICATE OF COMPLIANCE

This BRIEF complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(7)(A) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(4). This BRIEF was printed using a 14-point Times New Roman font.

This BRIEF complies with the type-volume limitation of Federal Circuit Rule 32(a). This BRIEF contains **11,058 words**, excluding the parts of the BRIEF exempted under the Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b)(1). This certificate was prepared in reliance on the word count of the word processing system (Microsoft® Word for Windows Version 2206) used to prepare the BRIEF.

**Date: August 28, 2024**

/s/ Franz A. Wakefield

**Franz A. Wakefield, *Pro Se***
**D|B|A COOLTVNETWORK.COM, INC.**
4 WEST LAS OLAS BOULEVARD; SUITE 1206
FORT LAUDERDALE, FLORIDA 33301
TELE: 305-206-4832
EMAIL: FRANZWAKEFIELD@COOLTVNETWORK.COM

# ADDENDUM

# FINAL ORDERS OF THE DISTRICT COURT

**U.S. District Court**
**District of Delaware (Wilmington)**

## CIVIL DOCKET FOR CASE #: 1:19-cv-00291-JLH

## CoolTVNetwork.com, Inc. v. Blackboard, Inc.

| | | |
|---|---|---|
| **01/25/2024** | **93** | **ORAL ORDER: Pending before the Court is Plaintiff's pro se "Rule 60 Motion." (No. 19-291, D.I 89; No. 19-292, D.I. 106; No. 19-293, D.I. 116; No. 19-194, D.I. 95; No. 19-295, D.I. 101; No. 19-296, D.I. 103; No. 19-297, D.I. 97; No. 19-534, D.I. 102; No. 19-535, D.I. 98.) When this case was filed in 2019, Plaintiff CoolTVNetwork.com, Inc. was a Limited Liability Company represented by licensed counsel. (D.I. 1, para 2.) LLCs cannot appear pro se in federal court. *See Dougherty v. Snyder*, 469 F. App'x 71, 72 (3d Cir. 2012). That said, it appears that Mr. Wakefield told the Federal Circuit on appeal in 2022 that Plaintiff was then operating as a "sole proprietorship," and the Federal Circuit accepted that representation and permitted Mr. Wakefield to appear pro se "on behalf of CoolTVNetwork.com." (No. 2021-2191, D.I. 104 (Fed. Cir. Sept. 1, 2022).) As Defendants do not oppose the Court ruling on the pending motion (*see, e.g.*, No. 19-291, D.I. 90 at 1 n.3), the Court has considered it. The motion is denied at least for the reason that it is untimely. The Clerk of Court shall e-mail a copy of this Order to Mr. Wakefield at the address set forth in his Motion. Ordered by Judge Jennifer L. Hall on 1/25/2024. Associated Cases: 1:19-cv-00291-JLH et al.(ceg) (Entered: 01/25/2024)** |

| | | |
|---|---|---|
| **05/20/2024** | **97** | **ORAL ORDER: Pending before the Court is Plaintiff's "Motion for Clarification/Reargument" (No. 19-291, D.I 94; No. 19-292, D.I. 111; No. 19-293, D.I. 121; No. 19-294, D.I. 100; No. 19-295, D.I. 106; No. 19-296, D.I. 108; No. 19-297, D.I. 102; No. 19-534, D.I. 107; No. 19-535, D.I. 103). Local Rule 7.15 states that [m]otions for reargument shall be sparingly granted. The decision on a motion for reargument is within the district court's discretion and such motions are granted usually only under circumstances where the court has patently misunderstood a party, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning but of apprehension. Those circumstances are not present here. Accordingly, the Motion is DENIED. Ordered by Judge Jennifer L. Hall on 5/20/2024. Associated Cases: 1:19-cv-00291-JLH et al.(ceg) (Entered: 05/20/2024)** |

US007162696B2

(12) United States Patent
Wakefield

(10) Patent No.: US 7,162,696 B2
(45) Date of Patent: Jan. 9, 2007

(54) **METHOD AND SYSTEM FOR CREATING, USING AND MODIFYING MULTIFUNCTIONAL WEBSITE HOT SPOTS**

(76) Inventor: **Franz Wakefield**, 17731 NW. 14th Ct., Miami, FL (US) 33169

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 409 days.

(21) Appl. No.: **09/877,729**

(22) Filed: **Jun. 8, 2001**

(65) **Prior Publication Data**

US 2002/0080165 A1 Jun. 27, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/210,300, filed on Jun. 8, 2000.

(51) **Int. Cl.**
*G06F 3/00* (2006.01)
*G06F 9/00* (2006.01)
*G06F 17/00* (2006.01)

(52) **U.S. Cl.** ...................... **715/716**; 715/733; 715/722; 715/719

(58) **Field of Classification Search** ................ 345/723, 345/726, 853; 370/401; 379/90.01, 93.07, 379/93.12, 93.14, 93.17; 704/240, 275; 705/26, 705/37; 707/3, 4, 5, 10, 104.1; 709/206, 709/218; 715/513
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,539,871 A 7/1996 Gibson
5,590,262 A * 12/1996 Isadore-Barreca ....... 715/500.1
5,708,845 A 1/1998 Wistendahl et al.
5,774,859 A * 6/1998 Houser et al. .............. 704/275
5,838,682 A * 11/1998 Dekelbaum et al. ........ 370/401
5,884,309 A * 3/1999 Vanechanos, Jr. ............ 707/10
5,893,091 A * 4/1999 Hunt et al. ..................... 707/3
5,905,975 A * 5/1999 Ausubel ...................... 705/37
5,918,012 A 6/1999 Astiz et al.
5,970,504 A 10/1999 Abe et al.
6,021,398 A * 2/2000 Ausubel ...................... 705/37
6,029,135 A * 2/2000 Krasle ........................ 704/275
6,075,526 A * 6/2000 Rothmuller .................. 715/721
6,122,647 A * 9/2000 Horowitz et al. ........... 715/513
6,570,587 B1* 5/2003 Efrat et al. ................. 345/723
6,573,908 B1* 6/2003 Jang ........................... 715/723
2002/0069405 A1* 6/2002 Chapin et al. ................ 725/32

* cited by examiner

*Primary Examiner*—Kristine Kincaid
*Assistant Examiner*—Boris Pesin
(74) *Attorney, Agent, or Firm*—Franz Antonio Wakefied, Pro, Se.

(57) **ABSTRACT**

A method, apparatus and system for creating, using and modifying multifunctional website hot spots including software that identifies, programs and activates hot spots with a plurality of functions wherein the functions include a shopping mode for selecting and purchasing items on a website or in a video, a digital call mode for facilitating videoconferencing and telephone calls over a globally accessible network, a digital storage area for selecting, retrieving and playing selected digital media files, a bid mode that facilitates audio and video communication during multi-task communication interface for conducting an auction and/or accepting bids, an interact mode for communicating a user with a live streamed digital media file, a link mode for directly linking to pre-identified URL addresses and an entertain mode for retrieving and activating digital media files, wherein the functions are selected based on user inputs or predetermined parameters and are activated by clicking a predetermined hot spot.

**18 Claims, 9 Drawing Sheets**




100
Start
101
User powers on computer
102
User initiates ClickVideoShop™ Software (CVSSW™)
103
(CVSSW™) reads configuration information
104
Is (CVSSW™) In Cooldigicall™ mode?
105
Yes
No
A
Is Another CVSSW™ client attempting to establish contact with the user?
106
Yes
No
Has the user entered the name of a CVSSW™ user to contact?
107
Yes
No
108
(CVSSW™) initiates a connection to facilitate audio & video communication between two CVSSW™ clients
109
(CVSSW™) maintains A/V connection between two clients
Yes
Has the user switched modes?
110
Yes
No
B
Is the user on a Cooldigicall™?
111
No

FIG. 1A


A
No
Is CVSSW™ in Bid Mode?
Yes
112
CVSSW™ initiates a ClickVideoBay™ and a ClickVideoHub™, a Multicast communication interface to facilitate A/V communication between multiple CVSSW™ clients consisting of the following sections: A whiteboard shared between CVSSW™ clients, a section for text input/output to provide chat rooms between CVSSW™ clients, a section to facilitate instant messaging, a section to facilitate auctions among CVSSW™ clients, with product listing and information presented via video or text, email notifications of selected meeting highlights, a section displaying the contents of the user's DigitalLocker™, with the ability to add audio and video media from the multicast meeting.
113
114
CVSSW™ executes the desired user action, including: updating the contents of each user's whiteboard to keep them in sync with all other users, updating the chat room section of the window with statements and replies from all users, processes bid submissions and approvals by users displaying email alerts containing information sending and displaying instant messages
B
No
Has the user switched Modes?
Yes
115
No
116
Is CVSSW™ in DigitalLocker™ Mode?
Yes
CVSSW™ displays a window containing the contents of the user's DigitalLocker™. It is a storage area hosted on a remote system that allows the user to save and playback all forms of audio and video media. It also facilitates the separation of audio and visual tracks and the storage of each track independently.
117
Has the user switched Modes?
Yes
118
No
No
119
127

FIG. 1B




FIG. 1B
CONTINUED



C
D
E
128
Is the current time position of the movie/video playback within the range specified by the custom object?
No
Yes
129
CVSSW™ highlights the area specified by the Hot Spot object
130
Did the user click the Hot spot?
No
Yes
131
Is CVSSW™ In ClickVideoshop™ mode?
Yes
No
CVSSW™ adds the product referenced by the hot spot object to the user's shopping cart
132
133
Is CVSSW™ In Link mode?
Yes
No
CVSSW™ opens with information relevant to the item referenced by the hot spot object. This information can be presented as a web page, JPEG, MPEG, or other multimedia format
134
135
Is CVSSW™ In Entertain mode?
Yes
No
CVSSW™ opens a movie whose content is related to the item referenced by the hot spot object
136
137
Is CVSSW™ In CoolInteract™ mode?
138
CVSSW™ plays a live audio/video stream that contains Hot Spots. A multicast communication window is also opened, and the user is able to control certain software functions via voice recognition


FIG. 1C


200
START
212
User powers on computer
214
User launches web browser
216
User loads an HTML document (locally or via a network) containing tags that pass parameters to the ClickVideoShop™ Java applet
218
The applet reads the data file
220
The applet creates and initializes custom-defined objects based on the information in the data file
222
The applet registers areas on the screen (called "hot spots") using a geometric region obtained from the custom-defined objects.
224
The applet loads the movie and draws a menu bar at the top or bottom of the area where the movie is displayed
226
A

FIG. 2A


A
The applet plays the movie
228
The applet highlights all hot spots for 10 seconds
230
Is the cursor over a hot spot?
232
Yes
No
Is the current time position of movie playback within the range specified by the custom-defined object?
234
Yes
No
The applet highlights the area specified by the hot spot object
236
Did the user click in the hot spot?
238
Yes
No
Is the applet in shop mode?
240
Yes
No
The applet adds the item specified by the custom-defined object to the user's shopping cart
242
Is the applet in entertain mode?
244
Yes
No
The applet opens another browser window, playing the movie located at the URL obtained from the custom-defined object
246
Is the applet in bid mode?
248
Yes
No
The applet enters a bid for the item specified by the custom-defined object into the bidding system specified by the custom-defined object
250
Is the applet in link mode?
252
Yes
No
The applet opens a browser window using the URL obtained from the custom-defined object
254
D
C
B

FIG. 2B

FIG. 2C


B
D
C
Did the user click in the control bar?
256
Yes
No
258
Did the user click on the "Shop" option?
Yes
260
The applet is put into "Shop" mode
No
262
Did the user click on the "Entertain" option?
Yes
264
The applet is put into "Entertain" mode
No
266
Did the user click on the "Bid" option?
Yes
268
The applet is put into "Bid" mode
No
270
Did the user click on the "Link" option?
Yes
272
The applet is put into "Link" mode
No
274
Has the end of the movie been reached?
No
Yes
276
Does the data file specify that the movie should continue looping?
Yes
No
STOP
278


CLICKVIDEOSHOP™
THE NEXT GENERATION INTERACTIVE SOFTWARE.
10
97
MOVIE/VIDEO [MEDIA] AREA
90
91
BIDDING SYSTEM...
92
CONNECTION STATUS
AREA 1
AREA 2
96
95
93
94
MULTICAST COMMUNICATION WINDOW
MODE SCROLL
94
MODE CONTROL BUTTONS/BAR
93
DIGITAL CALLING SYSTEM

FIG. 3




FIG. 4




FIG. 5

**CLICKVIDEOSHOP ™**

# METHOD AND SYSTEM FOR CREATING, USING AND MODIFYING MULTIFUNCTIONAL WEBSITE HOT SPOTS

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of provisional application Ser. No. 60/210,300 filed Jun. 8, 2000.

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

N/A

## COPYRIGHT NOTICE

A portion of the disclosure of this patent document contains material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or patent disclosure as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyrights rights whatsoever.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates generally to multifunctional website hot spots, i.e. hyperlinks, and more particularly, to a program or software based tool for creating, using, modifying and/or modifying multifunctional hot spots in web applications that run over a globally accessible network and a function expanding menu bar.

2. Description of the Background Art

Interactive digital media and the use of hyper-linking tools to visit a designated location or perform a pre-defined function, such as hot spots, are generally known in the art. For instance, hyper-linking tools have been developed for making text and graphics available for interactive use, such as linking to pages within a website or to other websites, making purchases or initiating other actions. A link is typically made using text, icons, images or other objects appearing in a display to access another text file, program or media function. NBCi (a trademark of NBC Internet, Inc.) provides a website at "quickclick.com" that assigns a hyperlink to certain words for accessing other webpages and/or websites when those words are clicked. Based on current technology, hot spots and hyper links are limited to preordained functions and are internally static, such that they have not been programmed or modified to perform a wide variety of functions. In addition, hot spots have not been widely adapted or incorporated into video files. As the applications employed on the Internet fail to adequately address the foregoing issues, the instant invention gives the end user the ability to effectively and efficiently control and change the response of multifunctional hot spots and hyperlinks on a website. Consequently, this invention would be well received, especially in connection with video.

As noted, the use of hyperlinks and hotspots are known in the art, however current applications are static and do not address the problems noted above. For instance, U.S. Pat. No. 5,918,012 discloses the hyperlinking of time-based data files and embedding movies into other file types. It does not disclose the use of hot spots, as contemplated by the instant invention, and does not load the data file at startup but rather consults it on every click. U.S. Pat. No. 5,708,845 discloses



a system for mapping hot spots in media content for interactive digital media program. This patent discloses data files being separate from the video and linking to additional types of data. However, it fails to disclose the ability to change the type of information each hot spot links to, or having a hot spot that links to multiple databases or sites. U.S. Pat. No. 5,539,871 discloses a method and system for accessing associated data sets in a multimedia environment in a data processing system and associating data with elements in a multimedia presentation. The user may elect to have the associated data set presented by selecting the additional graphic element associated with the animated element. U.S. Pat. No. 5,970,504 discloses a moving image anchoring and hypermedia apparatus which estimates the movement of an anchor based on the movement of the object with which the anchor is associated and time intervals in which the hyperlink is active.

The foregoing prior art fails to disclose hyperlink and hot spot technology that is flexible, adaptable for use in digital media files, such as audio and video, platform independent, multi-tasked, and changeable and adaptable in functionality. The prior art also fails to disclose a menu bar that communicates with hot spots for creating, using and modifying website hot spots. Hyperlink and hot spot technology having these specifications would be well received. Consequently, there exist a need for programmable hyperlinks, multifunctional hot spots and a corresponding interactive menu bar.

## SUMMARY OF THE INVENTION

The instant invention comprises an apparatus, system and method for creating multifunctional hotspots preferably for use in conjunction with digital media files, such as prerecorded and live-streamed audio and/or video, or other website content. The instant invention comprises software for expanding interaction between users and websites via a globally accessible network, such as the Internet or locally accessible networks. The software is preferably written in the JAVA programming language or other applications-based development software which is operational on a wide variety of computing platforms. The instant invention may further comprise source code that is convertible to executables as is known in the art. The software of the instant invention preferably facilitates the use of a digital media file, such as a digital video source or video stream, as a conduit for accessing related or targeted information through multifunctional hotspots imbedded or residing therein. The multifunctional hotspots may access information within the user's system, or a globally accessible network or over any local area network. Prerecorded and/or live streamed video is preferred as it provides a unique foundation for affording the user the opportunity to interact with video and other content in the website through activating with multifunctional hotspots having a plurality of different modes or functions. The multifunctional hot spots preferably comprise hyperlinks to other URL addresses and/or targeted databases. The multifunctional hot spots are preferably delineated by outlines or illumination, as visual cues to alert the user that clicking within the "multifunctional hot spot area will" give them access to additional information, files or locations. This is analogous to a hypertext link being highlighted in an HTML format when the cursor moves over it.

The software further comprises a function expandable menu bar for identifying, offering and delivering the plurality of activity modes of the instant invention. The function expandable menu bar comprises a plurality of different

activity modes or options which is preferably displayed at the bottom area of the video being played. The location of the function expandable menu bar may vary. The function expandable menu bar comprises a plurality of different modes/functions including a shop mode ("clickvideoshop™" a trademark of applicant), a digital call mode ("cooldigicall™" a trademark of applicant), a digital storage and retrieval mode ("digitallocker™" a trademark of applicant), a bid mode, an interact mode ("cool-interaction™" a trademark of applicant), a link mode, and an entertainment mode. A multifunctional hot spot can support one or more modes at any time. The shopping mode allows a user to fill a shopping cart with digital media files, the object or merchandise that was highlighted by the hot spot and other items for purchase. The digital call mode provides video conferencing and/or internet originated and operated telephone calls ("cooldigicalls™" a trademark of applicant) between two or more software users. The digitallocker mode provides a storage area for saving and playing digital media files selected therefrom. The bid mode facilitates audio and/or video communication between multiple users/clients in a multicast communication interface for conducting an auction and/or receiving bids for obtaining products or product information. The interact mode facilitates interaction between users and live-streamed Internet programs. The link mode hyperlinks to related or targeted web pages and/or web sites in an auxiliary browser. The entertain mode accesses related or targeted web sites, information and/or digital media files. Clicking an option in the menu bar determines the action to be taken when a user clicks on a multifunctional hot spot.

Hot spots support at least one of the modes provided by the function expandable menu bar and can support all modes if desired. The software of the instant invention provides for a virtually unlimited number of associations between digital media files, such as video and Internet accessible information. The menu bar is configured to expand for the support of additional relationships, actions and links. For example, during playback of a music video, a hot spot could load and make available in-depth product or performer information (Celebrity VideoTimeCapsules™) and (Celebrity VideoBiographies™ or Now-&-Then Entertainment News (a trademark of applicant) related to something in the video, a bid submission form, or an additional media file. The function of hot spots may vary during the running of a digital media file based on time stamps or other parameters. The action of the hot spots could be determined by a length of time into a video, or beginning and ending time stamps within the video or software correlating to the video. A multifunctional hot spot is activated when a user moves the cursor into the designated area at a point in time within the time-stamped interval in which the hot spot is specified to be active for a certain activity. An active hot spot is one in which the perimeter of its area is visible, or the area has been illuminated. A multifunctional hot spot comprises a designated area within a digital media file, such as a video stream or wave file for accessing information or data residing on a particular website or database. The hot spots may further include the beginning and ending time stamps specified in a data file, which may be loaded when a video is loaded and contain as many hot spot definitions as necessary. When a video reaches the end, a data file may specify whether or not the video should start at the beginning or some other designated location.

In accordance with the foregoing, it is an object of the instant invention to provide a software based apparatus,



system and/or method for multifunctional hotspots that may be created or modified in accordance with predetermined parameters or user inputs.

It is also an object of the instant invention to provide an apparatus, system and method for creating and/or modifying multifunctional hotspots with a plurality of applications that may be activated or rendered idle based on predetermined parameters or user inputs.

It is a further object of the instant invention to provide an expandable menu bar having a plurality of hot spot defining options and an interface for receiving user inputs for defining the next action of the hot spot based on the user input.

In accordance with these and other objects, which will become apparent hereinafter, the instant invention will now be described with particular reference to the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1A–1C** are a software flow diagram illustrating the operation, features and use of and user interaction with the instant invention in accordance with the preferred embodiment.

FIGS. **2A–2C** are a software flow diagram illustrating another embodiment of the operation, features and use of and user interaction with the instant invention.

FIGS. **3–5** are illustrative views of representative and alternative screen displays in accordance with the instant invention.

## DETAILED DESCRIPTION OF THE INVENTION

With reference to the drawings, FIGS. **1A–C** to **5** disclose the preferred embodiments of the instant invention which is generally referenced by numeric character **10** and/or as ClickVideoShop™ (a trademark of Applicant) system and/or software ("CVSSW", a trademark of Applicant). The instant invention **10** comprises an interactive software based system and device having processor readable code **100** and/or **200**, as shown in FIGS. **1A–1C** and **2A–2C**, respectively, stored on a tangible medium that can add, use, change, adapt and process hot spots, such as hyperlinks and other known actions, in video files, audio files, digital files and/or designated areas of a website or webpage, so as to provide multifunctional hot spots. The instant invention **10** adds multifunctional hot spots to video and/or audio files or other types of digital files and provides a means for using and modifying the functions of the hot spots. Thus, the hot spots may be programmed with multiple objects and/or functions that may be activated or deactivated through a menu bar **93** having a plurality of modes and means for activating same, such as control buttons **94** that define the hot spot(s) with a predetermined function in response to successful user interaction with the buttons **94** in accordance with the invention. The software of the invention **100**, **200**, hot spots and corresponding objects or applications are platform independent and may be defined in one or more databases. The hot spots may be programmed with hyperlinks, JAVA applications and/or other types of applications based code for performing various functions while a user is residing in a video file, audio file or other location within a webpage or website, such as making a bid in a bidding or auction system mode **91**, linking to another web page or URL address in a link mode, linking to other videos or audio files in an entertainment mode, placing a digital telephone call in a digital call mode, or transmitting or accessing other types of

communications, systems (e-mail, etc.) and information, as shown in FIGS. 1A–3. The invention 10 embeds, links or makes available multifunctional hot spots that change modes automatically based on predetermined parameters or user interaction with the menu bar 93 in the video file, audio file or other type of digital file or location with the corresponding website or webpage.

The hot spot functions comprise a plurality of actions that are accessible on the function expandable menu bar. The function expandable menu bar comprises the plurality of different functions or modes. The clickvideoshop™ mode is configured to perform various actions when activated. The shop mode allows a user to click a hot spot and add items to a shopping cart. The cooldigicall™ mode facilitates video conferencing and digital phone calls over a globally accessible network between two or more clickvideoshop™ software users. The digitallocker™ mode comprises a device and means for storing and retrieving audio media, video media or other designated data or files. The digitallocker™ modem mode may further facilitate the separation of audio and visual tracks as well as the storage of individual tracks independently. The bid mode facilitates audio and video communication between multiple clickvideoshop™ software users by initiating a clickvideobay™ (a trademark of Applicant) and clickvideohub™ (a trademark of applicant). The bid mode may provide a multi-cast communication interface by providing a shared white board, chat rooms, instant messaging, auctions for exchanging product and production information that is disseminated via video or text, e-mail notification of selected highlights and a view of the user's digitallocker™, with the ability to add audio and video from the multi-cast session. The interact mode facilitates interaction between the user and live-streamed internet programs. The user is able to communicate and/or interact with network designated queues by clicking on hot spots in a live audio and/or video streamed file being broadcasted over the internet. In the interactive mode, the user can also interact or communicate by using multi-task communication windows and the teleconference functions of the software, such as that provided by the digital call mode. In these modes, the user can activate a voice recognition function to activate certain software functions and initiate the multifunctional hot spots in the live streamed audio and/or video file. In the link mode, hot spots in the main audio and video file are initiated and open web pages, websites or other URL addresses in an adjacent browser or window or in a main playback browser/window. In the entertainment mode, the activation of hot spots causes the opening of related or targeted audio and video and/or video files related to the designated hot spot and an auxiliary browser/window. Examples of related video files may comprise Video Biographies™, Entertainment News™, Video Time Capsules™ and other entertaining audio and video files (VideoBiographies™, Now-And-Then Entertainment News™, and Celebrity VideoTimeCapsules™ are trademarks of Applicant).

The invention 10 may incorporate HTML language or a comparable language for loading documents through a web browser. The HTML document loaded by the web browser may contain a downloadable custom plug-in(s) that implements an algorithm, and/or tags that specify, among other things, the path to a Java applet containing the object, source, executable or application code necessary to execute the multifunctional hot spots and currently active function as defined by a predetermined parameter or user input; the path to the video or audio file that the applet will play; and/or the path to a data file that contains variables used to create objects and/or applications having the information needed to identify, define and activate the multifunctional hot spots and their location in designated areas on the screen or in the corresponding digital file. A data file contains tags that can specify various functions when a hot spot is activated, such as, whether the video file should only play once or play in a continuous loop; the URL of the web page or website to open when a hot spot is activated; an electronic signature that uniquely identifies a user and item(s) for adding to a shopping cart; the URL of a video file or audio file to play when a hot spot is activated; an electronic signature that uniquely identifies a purchased or auctioned item such that a request or bid for it can be entered into a multicast bidding or purchasing system; and/or an electronic signature that uniquely identifies an item or area on the screen that once initiated a communication system/digital calling system is activated in accordance with the digital call mode 95.

The instant invention requires, but is not limited to, at least one tag in the data file, and at least one of the above noted steps should be specified for defining the "hot spot's" functionality, as defined through the mode control bar 93. In accordance with the teachings of the instant invention, a "hot spot" can be programmed with more than one definition or functionality, and the mode control bar can be expanded to an indefinite number of mode control features and buttons.

Referring to FIGS. 1A–1C, the logic and operation of the preferred software 100 of the instant invention 10 is shown. With reference to FIG. 1A, the user powers up the computer and initiates the click video shop™ software 100, which reads the configuration information for the hot spots (101–104). The software 100 then determines what mode it is in for determining what action to take when a hot spot is activated. If the software 100 is in the digital call mode, then the software 100 determines whether another client is attempting to establish a contact with another user (105–106). If not, then the software 100 determines whether the user has entered a name of a user contact for initiating and placing a call (107). In either event, once a target user has been identified, the software 100 initiates a connection between the users/clients to facilitate audio and video communication between the clients (108). The software 100 maintains an A/V connection between the two clients throughout the call (109). Throughout the call, the software 100 monitors the activity to determine whether the primary client user has switched modes (110). If yes, then the software 100 moves back to determine what new mode has been activated. If a new mode has not been selected, then the software 100 continues to monitor whether the user is on the digital call and maintains the A/V connection between the two clients throughout the duration of the call (111).

With reference to FIG. 1B, the software 100 determines whether the user has selected the bid mode (112). If yes, then the software 100 initiates a ClickVideoBay™ in a ClickVideoHub™, which is a multicast communication interface to facilitate A/V communication between multiple clients (113). The multicast communication interface comprises a white board shared between software clients, a section for text input and output to provide chat rooms between software clients, a section to facilitate instant messaging, a section to facilitate auctions among software clients, with product listing information presented via video or text, e-mail notifications of selected meeting highlights, a section displaying the contents of a user's digital locker and the ability to add audio and video media from the multicast meeting (113). Thereafter, the software 100 executes the desired user action, including updating the contents of each user's white board to keep them in sync with all other users,

updating the chat room section of the window with statements and replies for all users, processing bid submissions and approvals by users, displaying e-mail alerts containing information, and sending and displaying instant messages (114). Throughout, the software 100 monitors whether the user has switched modes (115). If no, the software continues to execute the desired user actions. If yes, then the software 100 moves back to the mode identification routine.

The software 100 also determines whether the user has selected and activated the digital locker™ mode (116). If yes, then the software 100 initiates and displays a window containing the contents of the user's digital locker™ (117). The digital locker™ is a storage area hosted on a remote system or database that allows the user to save, retrieve and play back all digital forms of audio and video media. It also facilitates the separation of audio and visual tracks in the storage of each track independently. Throughout the digital locker™ mode, the software 100 monitors whether the user has switched modes (118).

If no mode is determined as being selected, the software 100 determines whether the user has exited the program (119). If not, the software 100 reads the multi-functional hot spot data file (HSDF) and creates and initializes custom defined objects based on information in the HSDF (121–122). The software 100 registers areas on the screen or in the video as multi-functional hot spots using a region obtained from the HSDF (123). The software 100 then loads the movie/video/audio file and activates and/or draws the menu bar 93 at the bottom of the video playback area or some other designated location (124). The software 100 then plays the movie/video/audio file (125). The hot spot is continuously monitored to determine whether the user has placed the cursor over a hot spot (126) and if not, it continues to play the file. If the user has placed the cursor over a hot spot, then the software 100 determines whether the current time position of the movie playback is within the range specified by the custom object (126–128). With reference to FIG. 1C, if the movie is within the time stamped range, then the software 100 highlights the area specified by the hot spot object (129). The program then determines whether the user has clicked the hot spot (130). If not, the program determines whether the user has changed modes or is remaining in the "play movie" mode. If the user clicks the hot spot, then the software 100 determines what mode the user has selected (130, 131, 133, 135, 137). Depending on the time stamped region and HSDF, the software 100 will activate the action corresponding to the mode and the video file time stamped range. If in the shop mode, then the software 100 will add products referenced by the hot spot to the user's shopping cart (132). If in the link mode, then software 100 opens with information relevant to the item referenced by the hot spot object and presents this information as a web page, jpeg, mpeg or other multi-media format (134). If the user has selected the entertainment mode, then the software 100 opens a movie/video/audio file whose content is related to the item referenced by the hot spot object as it correlates to the time stamped period in the video or movie (136). If the user has selected the cool interact™ mode then the software 100 plays a live audio/video stream that contains hot spots and a multicast communication window is open and the user is able to control certain software functions via voice recognition (138). The software 100 makes all modes available simultaneously for selection and continues to monitor user activity for determining what actions to take when a hot spot is activated, as shown in FIGS. 1A–1C.

The logic and operation of an embodiment of the software 200 of the invention 10 is shown in FIGS. 2A–2C. With reference to FIG. 2A, a user powers up the computer, launches a web browser and loads an HTML document containing a downloadable custom plug-in(s) that implements an algorithm and/or tags that pass parameters to a Java applet (212–218). It is important to note that a downloadable custom plug-in(s) may be used to implement an algorithm to perform the same tasks, instead of a Java applet. Consistent therewith, the applet reads the data file, creates and initializes custom defined objects or functions in accordance with the data file and registers areas on the screen as hot spots using a geometric region obtained from the custom defined objects (220–224). The applet loads the video or audio file and draws or uploads a menu bar 93 at the top, bottom or other location in or near the video area 90 where the video or audio file is displayed and plays the file (226–228). The applet gives a visual cue, such as highlights, illumination, or shading in or around the area of the hot spot(s) for a particular time interval, such as ten (10) seconds (230), which occurs while the movie is playing, but not necessarily all at the same time. Time stamps may be placed in the video or audio file or a corresponding routine for monitoring and communicating with the video and hot spot function for activating and deactivating functions based on the progress of the video or audio file in relation to the time stamps. User inputs in the menu bar 93 may override predetermined functions and/or time stamps.

With reference to FIG. 2B, the software 200 of the invention 10 continually monitors whether the screen cursor is over a hot spot (232). If the cursor is detected as not being over a hot spot, then the invention 10 determines whether a control bar action has been activated (256). If the cursor is detected as being over a hot spot, then it checks whether the current time position of the movie playback is within the range specified by the custom defined object (234). If the answer is no, then the program 10 determines whether a control bar action has been activated (256). If the time position is within the specified range, then the applet gives a visual cue in the area specified by the hot spot object (236). Next, the program of the invention determines whether the user has "clicked" or otherwise activated the hot spot. If no, then the program goes on to determine whether a control bar action has been activated (256). If the user activates the hot spot (i.e. clicks it), then the program determines the mode of the applet (240–252), as shown in FIG. 2B. If in the shop mode, the applet adds the items specified by the custom defined object to the user's shopping cart (240–242). If the applet is in the entertain mode, then it opens another browser window, playing the video or audio file located at the URL address obtained from the custom defined object in the corresponding hot spot (244–246). If the applet is in the bid mode, then it activates the bidding routine of the software and enters bids correlating to electronic signatures as they are made into the bidding system for the item specified by the custom defined object (248–250). If the applet is in the link mode, and the hot spot is activated then it the program opens a browser window and links to the URL obtained from the custom defined object in the hot spot (252–254). After determining the applet mode or lack thereof, the program 200 determines whether the user clicked or activated the mode or control buttons/bar 93.

Regardless of how the user or program 200 gets to the decision block for determining whether the user has clicked in the control bar 93, the program 200 proceeds with said inquiry and several other inquires depending on the responses. For instance, if the program determines that the

user has not clicked in the control bar (256), then it determines whether the video or audio file has reached the end (274). If not, the program 200 loops back to determine whether the cursor is over a hot spot (232). If the video or audio file is determined to have reached the end, then the program 200 checks the data file to see if the video should go into a continuous loop (276). If yes, then the program 200 loops back and continues playing the movie (228). If no, then the program stops (278). If the program has determined that the user has in fact clicked in the control bar (256), then it ascertains what mode was selected from the control bar (258–272). After the mode or option has been determined, the program checks to see if the video or audio file has reached the end, as described above (274–276).

Area 1 and Area 2 of FIG. 3 are Multicast Windows that are controlled by the mode control bar. The windows only appear when the video is placed in a particular mode (i.e. bid, cooldigicall™ (a trademark of Applicant), clickvideoshop™ (a trademark of Applicant), entertain, cool-interact™ (a trademark of Applicant), digitallocker™ (a trademark of Applicant), coolecall™ (a trademark of Applicant), play, or link . . . etc,). FIGS. 3–5 are illustrative views of representative and alternative screen displays in accordance with the instant invention. The shape of the Video Area, Multicast Windows, and general layout of the Entertainment Area are subject to design change. It should be understood that the invention is not limited to the disclosed embodiment, but on the contrary is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the claims. The instant invention has been shown and described herein in what is considered to be the most practical and preferred embodiment. It is recognized, however, that departures may be made there from within the scope of the invention and that obvious structural and/or functional modifications will occur to a person skilled in the art.

What is claimed is:

1. A Multifunctional Hot Spot apparatus comprising:

at least one hot spot defined by a communication with instructions stored on a tangible retaining medium;

at least one of the hot spots being accessible from a globally accessible network;

means for performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot;

wherein said hot spots reside on and are accessible from a digital video or audio file;

wherein said predetermined functions are selected from a mode control;

wherein the mode control comprises a plurality of modes;

wherein the plurality of modes comprise a shop mode, a bid mode, an interact mode, an entertainment mode, and a link mode;

wherein a specific mode is selected by a user through an expandable graphical user interface bar;

wherein said specific mode further toggles based on time stamps in said digital video or digital audio file;

wherein said hot spots are visualized by outlines, shading, or illumination or a combination of each, at a predetermined area on the display;

wherein said Multifunctional Hot Spot apparatus is made to reside on and is executing on a computing system;

means, defined by said instructions, for selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot.

2. An apparatus as recited in claim 1:

where said predetermined functions comprising:

means for further identifying items available on a website for purchase.

3. An apparatus as recited in claim 1:

where said predetermined functions comprising:

means for conducting an auction and receiving bids for the purchase of identified items, through a multicast communication window & interface.

4. An apparatus as recited in claim 1:

where said predetermined functions comprising:

means for linking to at least one predetermined URL address when said hot spot is activated.

5. An apparatus as recited in claim 1:

further comprising a means for storing and retrieving digital media, said digital media having at least one said Multifunctional Hot Spot defined therein.

6. An apparatus as recited in claim 1:

wherein said predetermined functions comprises:

means for calling a predetermined phone number or user when said hot spot is activated.

7. An apparatus as recited in claim 1:

further comprising a storage, retrieval, and modification-area apparatus:

means for providing sessions for storing, modifying, accessing and activating digital media when said Multifunctional Hot Spot is activated:

a set of processed or readable instructions storable on a retaining medium, providing a means for separating digital video and digital audio files in and from digital media and means defined to facilitate the separation of digital video and digital audio with at least one Multifunctional Hot Spot.

8. An apparatus as recited in claim 1, wherein said predetermined functions comprises:

a means for communicating a website or network user with

a digital media file having at least one said Multifunctional Hot Spot.

9. An apparatus as recited in claim 1, wherein said predetermined functions comprise:

a voice recognition means for activating at least one of said predetermined functions based on the sound of the user's voice.

10. An apparatus as recited in claim 1, wherein

said hot spots reside on and are accessible from at least one linked digital video file, wherein a linked digital video is accessible from digital video with at least one Multifunctional Hot Spot;

where said digital video is activated from a preset parameter, or upon reaching a particular segment in a digital media file;

wherein said digital video is based on a user's preference;

means defined for automatically launching digital video to the current user or launching to another active network user.

11. An apparatus as identified in claim 1:

wherein said hot spot resides in and is accessible from at least one, linked audio digital file, wherein linked digital audio is accessible from digital audio with at least one Multifunctional Hot Spot;

where said digital audio is activated from a preset parameter, or upon reaching a particular segment in a digital media file;

wherein said digital audio is based on a user's preference;

means defined for automatically launching digital audio to the current user or launching to another active network user.

12. An apparatus as recited in claim 1:

wherein said predetermined functions comprise:

at least one globally accessible address that is accessible through a globally accessible network when said corresponding identifier is selected.

13. An apparatus as recited in claim 1, where said means for selecting and activating comprises:

at least one predetermined parameter that activates a corresponding function from said plurality of functions when said parameter is satisfied.

14. An apparatus as recited in claim 13:

further comprising a means for overriding said parameter when a user selects at least one of said plurality of predetermined functions.

15. A tangible computer readable storage medium having computer readable program code portions stored therein, such that, when executed in a computer causes the computer to perform the steps of:

defining at least one hot spot by a communication with instructions stored on a tangible retaining medium;

accessing at least one of the hot spots from a globally accessible network;

performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot;

wherein said hot spots reside on and are accessible from a digital video or audio file;

wherein said predetermined functions are selected from a mode control;

wherein the mode control comprises a plurality of modes;

wherein the plurality of modes comprise a shop mode, a bid mode, an interact mode, an entertainment mode, and a link mode;

wherein a specific mode is selected by a user through an expandable graphical user interface bar;

wherein said specific mode further toggles based on time stamps in said digital video or digital audio file;

wherein said hot spots are visualized by outlines, shading, or illumination or a combination of each, at a predetermined area on the display;

wherein said Multifunctional Hot Spot apparatus is made to reside on and is executing on a computing system;

selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot.

16. An apparatus as recited in claim 1, further comprising:

means for adding at least one additional function to a predetermined hot spot.

17. A Multifunctional Hot Spot method comprising:

defining at least one hot spot by a communication with instructions stored on a tangible retaining medium;

accessing at least one of the hot spots from a globally accessible network;

performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot;

wherein said hot spots reside on and are accessible from a digital video or audio file;

wherein said predetermined functions are selected from a mode control;

wherein the mode control comprises a plurality of modes;

wherein the plurality of modes comprise a shop mode, a bid mode, an interact mode, an entertainment mode, and a link mode;

wherein a specific mode is selected by a user through an expandable graphical user interface bar;

wherein said specific mode further toggles based on time stamps in said digital video or digital audio file;

wherein said hot spots are visualized by outlines, shading, or illumination or a combination of each, at a predetermined area on the display;

wherein said Multifunctional Hot Spot apparatus is made to reside on and is executing on a computing system;

selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot.

18. a tangible computer readable storage medium having computer readable program code portions stored therein, such that, when executed in a computer causes the computer to perform the steps of:

defining at least one hot spot by a communication with instructions stored on a tangible retaining medium;

accessing at least one of the hot spots from a globally accessible network;

performing at least one of a plurality of predetermined functions executed with the selection of each particular hot spot;

wherein said hot spots reside on and are accessible from a digital video or audio file;

wherein said predetermined functions are selected from a mode control;

wherein the mode control comprises a plurality of modes;

wherein the plurality of modes comprise a shop mode, a bid mode, an interact mode, an entertainment mode, and a link mode;

wherein a specific mode is selected by a user through an expandable graphical user interface bar;

wherein said specific mode further toggles based on time stamps in said digital video or digital audio file;

wherein said hot spots are visualized by outlines, shading, or illumination or a combination of each, at a predetermined area on the display;

wherein said Multifunctional Hot Spot apparatus is made to reside on and is executing on a computing system;

selecting and activating at least one of said predetermined functions by clicking on each particular Multifunctional Hot Spot.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 7,162,696 B2
APPLICATION NO. : 09/877729
DATED : January 9, 2007
INVENTOR(S) : Wakefield

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page, item (74) *Attorney, Agent, or Firm*: Should read --Franz Antonio Wakefield, Pro Se. --.

Signed and Sealed this

Twenty-seventh Day of March, 2007



JON W. DUDAS
*Director of the United States Patent and Trademark Office*

ORIGIN ID:HWOA (305) 206-4832
FRANZ WAKEFIELD
COOLTVNETWORK.COM, INC
4 W LAS OLAS BLVD
SUITE 1206
FORT LAUDERDALE, FL 33301
UNITED STATES US

SHIP DAT
ACTWGT: 6.85 LB
CAD: 6570854/ROSA2550

TO **CLERK OF THE COURT**

**717 MADISON PLACE NW**

**WASHINGTON DC 20439**

(202) 275-8000 REF:
INV:
PO: DEPT:

**FedEx**
Express

**E**

**THU – 29 AUG 10:30A**
**PRIORITY OVERNIGHT**

TRK# 0201 **7782 3368 3886**

**XS VJIA**

**20439**
DC-US **IAD**